**NATIONAL STATE BANK OF NEWARK**

v.

**The UNITED STATES.**

**The BOWERY SAVINGS BANK**

v.

**The UNITED STATES.**

**Nos. 50–65, 60–65.**

United States Court of Claims.

March 18, 1966.

---

1. Plaintiff's motion to expunge certain portions of the brief of the United States is denied.

James Brent Clarke, Jr., Washington, D. C., attorney of record, for plaintiff in No. 50–65.

Stuart D. Root, New York City, for plaintiff in No. 60–65; George D. Reycraft, Washington, D. C., attorney of record.

Manfred J. Schmidt, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Russell W. Koskinen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

LARAMORE, Judge.

These actions come to us after having been consolidated for the sole purpose of resolving the issues raised by defendant's motions to dismiss. Both plaintiffs are banks seeking to recover additional mortgage insurance benefits pursuant to contracts with the Federal Housing Administration (FHA). Defendant has moved to dismiss their claims for failure to state a claim upon which relief can be granted, and on the additional ground in the National State Bank of Newark action, that plaintiff has failed to state a cause of action over which this court has jurisdiction. The substance of each motion is that only the FHA, and not the United States, has consented to be sued in this type of case and that this is shown by the applicable case law and by the fact that the proper remedy is the award of debentures issued by the Housing Insurance Fund, and not money judgment.

In response to defendant's motions, plaintiffs assert that their claims are comprehended by the Tucker Act, 28 U.S.C. § 1491 (1964 Ed.), but concede that this court cannot compel the FHA to issue debentures, and accordingly beg leave to amend their petitions to demand money judgments which defendant can discharge at its option by payment of debentures. We hold that the United States is subject to suit on these claims, and also give plaintiffs leave to amend their pleadings to petition for money judgments.

In dealing with defendant's contentions, we need only set out a skeleton of the facts; the details are best left to a footnote.[1]   Both plaintiffs purchased

1. National State Bank of Newark (Newark) alleges that it agreed with Taylor International Corporation (Taylor) to make a mortgage loan of $3,326,400 for the construction of an apartment building in Newark, New Jersey. The agreement provided: (1) that the loan would be made to 555 Mount Prospect Corporation (Prospect), a newly-formed subsidiary of Taylor; (2) that the loan would be FHA insured; (3) that the Prudential Insurance Company (Prudential) would provide permanent financing after construction by purchasing Newark's mort-

mortgages insured by the FHA under section 207 of the National Housing Act, ch. 847, 48 Stat. 1246, 1252 (1934), as amended, 12 U.S.C. § 1713 (1964 Ed.). That provision contains the basic scheme of mortgage insurance under which the FHA guarantees or insures qualifying mortgages.[2] To finance this insurance, lenders or mortgagees pay a premium charge to the FHA which deposits it into the Housing Insurance Fund.[3] Upon default, the mortgagee can receive the benefits of this insurance by assigning its interest in the mortgage to the FHA. Benefits are payable exclusively in debentures issued by the Housing Insurance Fund. These debentures are interest-bearing and "fully and unconditionally guaranteed as to principal and interest by the United States." 12 U.S.C. § 1713(i) (1964 Ed.). The FHA has already paid each plaintiff a substantial amount of its claimed insurance benefits. It denied the balance of each claim, apparently on the theory that plaintiffs had received equivalent amounts through independent financing arrangements with the borrower-mortgagors.[4] These balances are the subject of plaintiffs' claims here.

■■ As a court of claims, a necessary antecedent to our jurisdiction is the waiver of sovereign immunity. In chapter 91 of 28 U.S.C. §§ 1491–1506, Congress has waived the immunity of the United States in many classes of actions. The Tucker Act, 28 U.S.C. § 1491, is the waiver provision relied upon here. It is broad—e. g., waiving immunity in suits founded upon acts of Congress, upon regulations of an executive department, or upon express or implied contracts with the United States—and, we believe, sufficiently broad to encompass these plaintiffs' claims. We feel that the facts accepted for purposes of these motions to dismiss show that the FHA was acting within the scope of its authority, as agent, for the United States, as principal, in carrying out the purposes of the National Housing Act. By using the FHA to carry out such purposes, the United States submits itself to suit un-

gage at a 5½% discount ($182,952); and (4) that Taylor would give Newark promissory notes to cover the discount. Subsequently, Newark purchased Prudential's commitment for $16,632. On September 1, 1962, Prospect defaulted on the construction loan payments. On November 16, 1962, Newark notified the FHA that it would elect to assign the mortgages in exchange for debentures. The assignment was completed on December 11, 1962. Newark also voluntarily assigned the partially unpaid promissory notes of Taylor with an outstanding principal balance of $76,230. The FHA acknowledged a valid claim under the insurance contract for the unpaid balance of the construction mortgage loan, but disallowed $90,090 of Newark's claim on the ground that it should not be able to retain the discount payments already made by Taylor ($106,-722), less the amount paid to Prudential ($16,632). Newark now claims an amount equal to $90,090 worth of debentures with an issue date of September 1, 1962.

The Bowery Savings Bank (Bowery) alleges that it agreed with The Title Insurance Corporation of Pennsylvania (Pennsylvania) to purchase a mortgage note and mortgage in the amount of $15,-657,700 of the 2401 Pennsylvania Avenue Corporation. The purchase agreement provided that Pennsylvania would pay Bowery 2% of each sum advanced under the building loan agreement to be retained in escrow. Upon default, Bowery could terminate the escrow and retain the balance as liquidated damages. Bowery advanced a total of $14,003,632, each advance being approved for insurance by the FHA. On December 1, 1963, Pennsylvania defaulted. Bowery notified the FHA on December 3 and terminated the escrow on December 24. On June 12, 1964, Bowery assigned the mortgage note and mortgage to the FHA, demanding debentures in return. The FHA acknowledged the full claim except for $280,-072.65, the amount of the escrow retained, and another amount not here in issue. Bowery claims an amount equal to $280,-072.65 worth of debentures with an issue date of March 1, 1964, plus $22.65.

2. To qualify under section 207, mortgages must secure loans for "low-cost housing."

3. In reality, the borrower or mortgagor pays these premiums as part of its regular payments on the loan.

4. See n. 1, supra.

der the Tucker Act unless there is some specific provision to the contrary.

The notion that the United States should be subject to suits relating to acts of its agents is suggested by the reasoning of National Cored Forgings Co. v. United States, 115 F.Supp. 469, 126 Ct. Cl. 250 (1953) (On Plaintiffs' Motion to Strike and Defendant's Motion for Judgment on the Pleadings), modified, 132 F. Supp. 454, 132 Ct.Cl. 11 (1955) (On the Proofs). There, the plaintiff[5] sought damages for the breach of an alleged contract with the Reconstruction Finance Corporation (RFC) which plaintiff claimed guaranteed it a market for the sale of houses. Simultaneously with the filing of the petition in this court, plaintiff complained in a District Court against the RFC in its corporate capacity. In 1953, we denied defendant's motion for judgment on the pleadings principally on the ground that the United States could be sued in the Court of Claims as principal on a contract to which a government corporation, acting in its corporate capacity, was a party. 115 F.Supp. 469, 474–475, 126 Ct.Cl. 250, 258–260. The defendant had asked us, among other things, to dismiss the case under 28 U.S.C. § 1500 (1964 Ed.). At that time, we concluded that the RFC in the District Court, and the United States as principal in the Court of Claims, were different parties. We reversed ourselves on this point in 132 F.Supp. 454, 132 Ct.Cl. 11, holding that the pendency of the suit in the District Court necessitated dismissal under 28 U.S.C. § 1500. In so holding, we overruled First National Steamship Co. v. United States, 90 Ct.Cl. 632 (1940). Our analysis of section 1500 emphasized the part which states that the Court of Claims shall be deprived of jurisdiction where the identical claim is pending in any other court "against * * * any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly

under the authority of the United States." In applying this language to the facts, we said:

The RFC and the other Government corporations are agents of the United States and clearly, when their acts are within their statutory authority, they are acting under the authority of the United States. [Cases omitted.]

When a Government corporation acting within the scope of its statutory authority makes a contract as the agent of the United States, the United States may be sued in this court as principal on the contract. * * *

* * * * * *

We are of the opinion that when the RFC acts within its statutory authority it contracts both in its corporate capacity and as an agent of the United States and that an aggrieved contractor with the RFC may bring his cause of action in either the District Court against the corporation or in this court against the United States. But it cannot bring a suit on the same cause of action or claim in both courts because of the prohibitions of section 1500, supra. [132 F.Supp. 454, 458–459, 132 Ct.Cl. 11, 18–19.]

*National Cored Forgings* was the logical extension of two prior cases which laid a foundation for the theory that the United States was responsible in the Court of Claims for the contract breaches of a "corporation * * * created solely to perform governmental objectives." Crooks Terminal Warehouses, Inc., Chicago, Ill. v. United States, 92 Ct.Cl. 401, 414 (1941); John Morrell & Co. v. United States, 89 Ct.Cl. 167 (1939). In both, plaintiffs' claims were based on the contracting acts of Federal Surplus Relief Corporations. These were corporations chartered under state law, but created by the President for the purpose of "encouraging national industrial recovery" under the authority of the National Industrial Recovery Act, ch. 90, 48 Stat. 195 (1933).

---

5. In National Cored Forgings, there were two plaintiffs, but for purposes of discussion, we refer to them as one. The plaintiffs were related corporations, thus the consolidation was not for a limited purpose as in this case.

A still stronger case favoring the result in *National Cored Forgings* was Ex Parte Skinner & Eddy Corp., 265 U.S. 86, 44 S.Ct. 446, 68 L.Ed. 912 (1924). The plaintiff there, a shipbuilder, originally petitioned in this court for anticipated profits "lost" because the United States Shipping Board Emergency Fleet Corporation cancelled a contract. The jurisdictional dispute came about because the plaintiff, with a view to initiating its action in a state court, moved to dismiss its suit in this court without prejudice. That motion was granted, and plaintiff immediately filed a petition in a state court. The government, suddenly awakened by the fact that it had a counterclaim which would be tried by a jury in the state court if plaintiff's transfer were allowed to stand, asked leave to file its counterclaim and objected to the grant of plaintiff's motion. The earlier order was vacated. In issuing a writ of mandamus ordering this court to reinstate the order to dismiss, the Supreme Court observed that the Emergency Fleet Corporation, a creature of World War I shipbuilding needs, "was certainly acting or professing to act, mediately or immediately, under the authority of the United States" for purposes of the predecessor to 28 U.S.C. § 1500. 265 U.S. 86, 95, 44 S.Ct. 446, 448. To the same effect, but relating to different subject matter, is language in other cases. See Inland Waterways Corp. v. Young, 309 U.S. 517, 524, 60 S.Ct. 646, 84 L.Ed. 901 (1940) (involving the Inland Waterways Corporation and the United States Shipping Board Merchant Fleet Corporation); Graves v. People of State of New York, ex rel. O'Keefe, 306 U.S. 466, 476–477, 59 S.Ct. 595, 83 L.Ed. 927 (1939) (involving the Home Owners' Loan Corporation); Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 389–392, 59 S.Ct. 516, 83 L.Ed. 784 (1939) (involving the Reconstruction Finance Corporation).

The present case is the logical extension of *National Cored Forgings,* and really brings us full circle to Crooks Terminal Warehouses, Inc., Chicago, Ill. v. United States, supra, and John Morrell & Co. v. United States, supra. While the problem here does not arise under 28 U.S.C. § 1500, the issue is substantially the same. An essential part of our holding in the earlier case was that a plaintiff could sue on an RFC contract "in either the District Court against the corporation or in this court against the United States." 132 F.Supp. 454, 459, 132 Ct.Cl. 11, 19. So, the only question remaining is whether the FHA, like the RFC, was established as an agency "for doing work of the government." Keifer & Keifer v. Reconstruction Finance Corporation, supra, 306 U.S. at 389, 59 S.Ct. at 517. That it was, seems clear for a number of reasons.

We need not make any exhaustive review of the history of housing legislation to say that the FHA was established to do things that private corporations do not do.[6] Although its identity with

---

6. The stated purpose of the National Housing Act, ch. 847, 48 Stat. 1246 (1934), was "[t]o encourage improvement in housing standards and conditions, to provide a system of mutual mortgage insurance, and for other purposes."

When the Reorganization Plan proposing to merge the FHA into the Housing and Home Finance Agency was sent to Congress in 1947, President Truman accompanied it with the following message:

The provision of adequate housing will remain a major national objective throughout the next decade. The primary responsibility for meeting housing needs rests, and must continue to rest, with private industry, as I have stated on other occasions. The Federal Government, however, has an important role to play in stimulating and facilitating home construction.

\* \* \* \* \* \*

The Congress also created a system for the insurance of home loans and mortgages to stimulate the flow of capital into home-mortgage lending and thereby facilitate home ownership and improvement and increase home construction. These measures were supplemented by legislation extending financial assistance to local communities for the clearance of slums and the provision of decent housing for families of low income who otherwise would be forced to live in the slums. It is significant that these programs were first

the government may not be total (we are not sure that it is not), we have no difficulty concluding that its insurance function is a government activity. Section 1713 of 12 U.S.C. provides in detail for an insurance scheme for "low-cost" rental housing. The exhaustive regulations in 24 C.F.R. § 207.1–.264 (1965 Ed.) fill in the interstices. This is hardly the picture we would expect for a "normal" insurance corporation. When we add to this the fact that the FHA was consolidated with sibling "corporations" into the Housing and Home Finance Agency (HHFA) in 1947,[7] we are further persuaded that the FHA acts "directly or indirectly under the authority of the United States."

Recent developments are interesting.[8] The Housing and Urban Development Act of 1965, 79 Stat. 451, creating the Department of Housing and Urban Development (HUD), puts the HHFA and its constituent parts into the new Department, extends FHA insurance programs, and gives the FHA additional powers. Its history is illuminating. With respect to extending FHA insurance programs for low- and moderate-income persons, a House report states:

> These programs are FHA's principal programs for assisting housing for low- and moderate-income families, and displaced families. *They are an important part of the total package of Federal housing programs.* [Emphasis added.] [H.Rep. No. 365, 89th Cong., 1st Sess. (1965), p. 2620]

Plaintiffs' claims are based on section 207 of the National Housing Act, 12 U.S.C. § 1713, relating to low-cost housing insurance, whereas the quoted language refers to section 221 of the Act, 12 U.S.C. § 1715*l*, insurance for loans to low- and moderate-income families. The comment would seem to be equally applicable to all FHA activities, however. If this is in doubt, reference to Title II of the 1965 Act dealing with broadened "FHA Insurance Operations" and its accompanying history contained in the report cited above, should set the matter to rest. In a broader sense, the President's message makes the same point:

> The Housing and Home Finance Agency was created two decades ago. It has taken on many new programs. Others are proposed in this message. Much of our hopes for American progress will depend on the effectiveness with which these programs are carried forward. These problems are already in the front rank of national concern and interest. They deserve to be in the front rank of government as well. [111 Cong.Rec. 3812 (1965).]

The foregoing becomes particularly significant when we look at the history of RFC functions after *National Cored Forgings*. We note that the RFC was created by an act "[t]o provide emergency financing facilities for financial institutions, to aid in financing agriculture, commerce, and industry, and for other purposes." Ch. 8, 47 Stat. 5, as amended, 15 U.S.C. §§ 601–619 (1964 Ed.). This is the same kind of purpose as enunciated in the National Housing Act. In 1957, pursuant to Reorganization Plan No. 1, 71 Stat. 647, many RFC functions were transferred to HHFA, the corporation was abolished, the capital stock was retired, and the proceeds were paid to the United States Treasury. In other words, what we said about the RFC in *National Cored Forgings* we should be able to say

---

established, and have been continued, by the Congress because of their special contributions to home construction and improvement. [Message of the President, Reorganization Plan No. 3 of 1947, 61 Stat. 954, 5 U.S.C. § 133y–16 (p. 191) (1964 Ed.).]

7. 61 Stat. 954.

8. We mention the 1965 developments only to complete the story of the FHA's move through the Federal hierarchy. We do not rely on whatever inference can be drawn from the history of the 1965 legislation to show that at the time the FHA did the complained of acts it was the agent of the United States. We are confident that the facts and prior legislative history establish that agency relationship without more.

about whatever agency it is within HH FA that now performs RFC functions. We do not know what the precise division of duties has been. We are satisfied that as parts of HHFA, both the successor to the operations of the RFC and the FHA "are important part[s] of the total package of Federal housing programs."

The defendant appears to concede that the FHA is an agency of the government, but contends that it does not follow that "these instrumentalities become the government's conduit for suit against it." The argument is that Congress authorized the FHA Commissioner "in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal," Banking Act of 1935, § 344(a), ch. 614, 49 Stat. 684, 722, as amended, 12 U.S.C. § 1702 (1964 Ed.), and that this constitutes but a limited waiver of sovereign immunity, leaving the claimant a remedy against the FHA *only*. Defendant buttresses the argument with two cases. Federal Housing Administration, Region No. 4 v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940); Waylyn Corp. v. United States, 231 F.2d 544 (1st Cir.), cert. denied, 352 U.S. 827, 77 S.Ct. 40, 1 L.Ed.2d 49 (1956).

In *Burr,* the plaintiff had a state court judgment against an FHA employee. To execute the judgment, he had a Michigan court issue a writ of garnishment to the FHA to garnish a salary claim of the employee who was then dead. The Supreme Court affirmed the Michigan order, holding that garnishment came within the scope of the FHA authorization to sue and be sued. In an opinion by Justice Douglas, the Court reasoned that Congress could have given the FHA complete immunity, but it chose to waive immunity because it wanted to put the FHA on the same footing with enterprises in the "commercial world." 309 U.S. 242, 244–245, 60 S.Ct. 488. Defendant pins its hopes on the last paragraph of the opinion which states, in part:

> And so far as the federal statute is concerned, execution is not barred, for it would seem to be part of the civil process embraced within the "sue and

be sued" clause. That does not, of course, mean that any funds or property of the United States can be held responsible for this judgment. Claims against a corporation are normally collectible only from corporate assets. That is true here. Congress has specifically directed that all such claims against the Federal Housing Administration of the type here involved "shall be paid out of funds made available by this Act." § 1. Hence those funds, and only those, are subject to execution. The result is that only those funds which have been paid over to the Federal Housing Administration in accordance with § 1 and which are in its possession, severed from Treasury funds and Treasury control, are subject to execution. Since no consent to reach government funds has been given, execution thereon would run counter to Buchanan v. Alexander, supra. [4 How. 20, 45 U.S. 20, 11 L.Ed. 857 (1846).] To conclude otherwise would be to allow proceedings against the United States where it had not waived its immunity. This restriction on execution may as a practical matter deprive it of utility, since funds of petitioner appear to be deposited with the Treasurer of the United States and payments and other obligations are made through the Chief Disbursing Officer of the Treasury. But that is an inherent limitation, under this statutory scheme, on the legal remedies which Congress has provided. And since respondent obtains its right to sue from Congress, it necessarily must take it subject to such restrictions as have been imposed. The fact that execution may prove futile is one of the notorious incidents of litigation, as is the fact that execution is not an indispensable adjunct of the judicial process. [Footnotes omitted.] [309 U.S. 242, 250–251, 60 S.Ct. 488, 493.]

The First Circuit purports to follow Burr in Waylyn Corp. v. United States, supra. There, the United States for the FHA sued in the District Court of Puerto Rico to recover on mortgage notes originally payable to a bank but payable to

the FHA by assignment after defendant's default. Defendant Waylyn Corporation counterclaimed on a tort theory, alleging that the FHA had interfered with the development of the housing project. In affirming the dismissal of this counterclaim, the court quoted the above passage from *Burr* and stated that the United States could not be sued on such a claim because it had not given consent. (The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (1964 Ed.), was not in issue.)

We feel that these cases are distinguishable because their facts did not permit application of the Tucker Act. *Burr* involved garnishment which is a proceeding clearly without the coverage of 28 U.S.C. § 1491. The same is true of the tort counterclaim in *Waylyn*. Because the language in *Burr* might be considered sufficiently broad to cover all claims against the United States,[9] we look for something to indicate a narrower application, and we find it in the following portion of the above-quoted passage from *Burr*:

> Since no consent to reach government funds has been given, execution thereon would run counter to Buchanan v. Alexander, supra. To conclude otherwise would be to allow proceedings against the United States where it had not waived its immunity.

We read this as saying that the United States has not consented to be sued by way of garnishment proceedings. In this sense, the FHA consent to be sued under 12 U.S.C. § 1702 is broader than the United States consent to be sued under 28 U.S.C. § 1491.

■ Stated differently, the statement relied upon by defendant is inapplicable to this case, not only because of the fact that garnishment, and not a government contract, was involved, but also because, as a matter of law, the United States had unquestionably not given its consent to have Treasury assets garnisheed. *Waylyn* can be viewed similarly. Although perhaps it takes the *Burr* language a bit further, it can fairly be distinguished on the ground that the United States had not consented to be sued on the kind of counterclaim asserted by the Waylyn Corporation (except perhaps under the Federal Tort Claims Act, supra, not there involved). Thus, in the present case, we are holding that we have concurrent jurisdiction with "any court of competent jurisdiction, State or Federal," to entertain plaintiffs' claims. Our jurisdiction is derived from the Tucker Act and that of the other courts is derived from the FHA's "to sue and be sued" clause.

Related to its primary argument that the United States has not consented to be sued on these claims, defendant argues that section 207(i) of the National Housing Act, 12 U.S.C. § 1713(i) (1964 Ed.) provides an exclusive remedy which this court is not empowered to award. The statutory scheme gives the mortgagee the right to assign the mortgage to the FHA upon default, in exchange for which the FHA issues debentures with a face value in the amount of the indebtedness. These are interest-bearing debentures having the following characteristics:

> They shall be paid out of the Housing Fund which shall be primarily liable therefor, and they shall be fully and unconditionally guaranteed as to principal and interest by the United States, and such guaranty shall be ex-

---

**9.** Looking to that part of the quote which states: "Congress has specifically directed that all such claims against the Federal Housing Administration *of the type here involved* 'shall be paid out of funds made available by this Act.' § 1." (Emphasis added.)—it seems that the Court expressly limited the holding to expenses covered by section 1 of the National Housing Act. 48 Stat. 1246 (1934). The section 1 "shall be limited" clause appears to refer to administrative expenses. The garnishment in *Burr* related to a wage claim clearly within the coverage of "[a]ll such compensation, expenses, and allowances shall be paid out of funds made available by this Act." Thus, *Burr* can be distinguished on this ground alone. We go on to distinguish *Burr* on the immunity point because we rely on the Tucker Act which was not available to the plaintiff in *Burr*.

pressed on the face of the debentures. In the event the Housing Fund fails to pay upon demand, when due, the principal of or interest on any debentures so guaranteed, the Secretary of the Treasury shall pay to the holders the amount thereof which is authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, and thereupon, to the extent of the amount so paid, the Secretary of the Treasury shall succeed to all the rights of the holders of such debentures. [12 U.S.C. § 1713(i) (1964 Ed.).]

The argument is that only the FHA Housing Insurance Fund is liable for insurance benefits, and that a judgment by this court would assess the general revenues of the Treasury. Defendant again refers to Federal Housing Administration, etc. v. Burr, supra, this time focusing on the latter part of the *Burr* quotation (referring to the possible futility of garnishment) set out above.

■ We disagree with defendant's view. We find nothing in the insurance benefits provisions to indicate any intention to extract from the Tucker Act's broad coverage claims based on the acts of the Housing Insurance Fund. Defendant's argument is really no more than a variation on its initial argument that immunity has only been waived as to suits against the FHA. Here, we are asked to analogize the debenture scheme to garnishment, and therefore apply the reasoning in *Burr*. It is our view that the debenture scheme is altogether different from garnishment. We think it

significant that the debenture scheme provides for a United States guaranty of all Housing Insurance Fund debentures and a duty on the part of the Secretary of the Treasury to pay debenture holders "out of any money in the Treasury not otherwise appropriated" if the Housing Insurance Fund fails to pay upon demand. 28 U.S.C. § 1713(i).

■ The final argument against our jurisdiction is that plaintiffs seek a recovery in debentures, where as this court is limited to awarding money judgments. That a final judgment in this court must be stated as a monetary equivalent, requires no citation of authority. However, money judgments can be conditional. In responding to defendant's motions to dismiss, plaintiffs concede that this court can give money judgments only and does not have jurisdiction to direct the FHA to issue debentures. Accordingly, they ask leave to amend their petitions to demand money judgments, with the entry to be permanently stayed if within 30 days debentures are issued by the Housing Insurance Fund. We think the petition is currently defective, and this proposed amendment is curative.

In conclusion, we hold that this court has jurisdiction over plaintiffs' claims under 28 U.S.C. § 1491, but that the petitions must be limited to claims for money judgment.

Accordingly, defendant's motions to dismiss the petitions are denied, and plaintiffs' consolidated motion to amend their petitions is granted.