T. O. F. C., INC.

v.

The UNITED STATES.

No. 207–81C.

United States Court of Claims.

June 30, 1982.

William T. Estabrook, Washington, D. C., attorney of record, for plaintiff. George R. Royer, Toledo, Ohio, of counsel.

Richmond L. McKay, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KASHIWA and SMITH, Judges.

## ON DEFENDANT'S MOTION TO DISMISS

SMITH, Judge, delivered the opinion of the court:

In this case plaintiff claims that it is entitled to compensation from defendant upon the ground either of an express or implied contract with defendant or of a taking which falls within the purview of the fifth amendment. We hold that any contract claim that plaintiff has must be against the Consolidated Railroad Corporation (Conrail), an entity over which we have no jurisdiction. We further hold that the actions of defendant did not result in a taking of plaintiff's property which is compensable under the fifth amendment.

Plaintiff's claims concern a September 27, 1960, contract between plaintiff and the Erie Railroad Company, later called the Erie-Lackawanna Railroad Company (Erie). By the terms of the contract, the parties constructed facilities for transferring highway semi-trailers to and from railroad flat cars, known as "piggyback" loading terminals. Erie retained or took title to the facilities and the related land. Plaintiff did not take a lien on the properties. Plaintiff,

however, was given the exclusive right to operate the facilities. Erie agreed to pay plaintiff, in addition to the fees for the use of the facilities, determinable sums certain at the rate of $0.75 per revenue motor common carrier trailer handled at these facilities, operated by plaintiff, for designated periods in order to reimburse plaintiff for its investment in the terminals.

Erie made the agreed payments to plaintiff until Erie filed for bankruptcy on June 27, 1972. Thereafter, Erie's obligations were performed by the trustee in bankruptcy, pursuant to court order, until the trustee, in accordance with the Regional Rail Reorganization Act of 1973 (RRRA),[1] transferred all of Erie's properties to Conrail on April 1, 1976. Conrail accepted Erie's property, including the facilities involved herein at Chicago, Illinois, and Croxton, New Jersey, and apparently at Cleveland, Ohio, but refused to assume Erie's obligations to plaintiff for the payment of the $0.75 per revenue carrier trailer handled at the facilities.

On February 15, 1978, the Special Master for the federal district court supervising the reorganization of Erie held that plaintiff was entitled to be recognized as a creditor of Erie to the extent it could show damages.[2]

In its opinion of July 24, 1979, the federal district court reversed the Special Master's decision on Erie's liability to plaintiff and held that plaintiff had no claim against Erie's bankruptcy estate based on their agreement.[3] The district court concluded that since Conrail, and not Erie, used plaintiff's facilities after March 31, 1976, the contract clause which triggered payments from Erie to plaintiff, i.e., the payment of $0.75 per revenue motor common carrier handled by plaintiff for Erie, ceased to be applicable to Erie. In other words, Erie's duty of performance had been excused by

---

1. Regional Rail Reorganization Act of 1973, Pub.L.No.93–236, 87 Stat. 986 (1974).

2. *In re Erie L. Ry.*, No. B72–2838 (N.D.Ohio Feb. 15, 1978) (Special Master's Order on Liability and Related Questions).

3. *In re Erie L. Ry.*, No. B72–2838 (N.D.Ohio July 24, 1979).

the nonoccurrence of an express condition precedent. The court further concluded that Erie had no obligation to plaintiff outside of the $0.75 per carrier payments. Finally, the court noted that its decision did not reach the issue whether plaintiff has any recognizable claims against Conrail or the United States by reason of Conrail's refusal to accept the assignment of the agreement.

The United States Court of Appeals for the Sixth Circuit affirmed the district court's decision and held that article seventh of the contract controlled Erie's obligation to plaintiff, and that article "conditioned Erie's obligation to repay T.O.F.C. upon Erie's earning revenue on trailers which it moved through the facilities. Since Erie has received no additional revenue since April 1, 1976, it has no liability." [4]

Plaintiff filed its petition with this court on April 1, 1981. After receiving and reviewing briefs from both sides, the court in its order of October 23, 1981, requested both parties to inform the court of the status of plaintiff's claim in relation to the proceedings before the Special Court concerning the Erie-Lackawanna Railroad Company.[5] The parties have responded to the court's order and we now issue this opinion.

I.

As stated above, plaintiff bases its claims that it is entitled to receive damages from defendant upon two grounds. First, plaintiff claims that the Government, through the workings of the RRRA's provisions, effectively entered into an express or implied contract with plaintiff whereby defendant assumed Erie's obligations under its agreement with plaintiff. Second, plaintiff claims that the transfer of the railroad facilities in question to Conrail without compensation to plaintiff violates the taking clause of the fifth amendment to the Constitution.

Defendant bases its motion to dismiss on three grounds. First, if any entity has entered into a contract with plaintiff concerning the railroad facilities, it must be Conrail, and defendant argues that Conrail cannot be sued in this court. Second, if Conrail can be sued in this court, or, if it is the Government which has entered into a contract with plaintiff, the contract is one which is implied-in-law and, therefore, is also outside the court's jurisdiction. Third, defendant has taken no action which can be construed as a compensable taking under the fifth amendment to the Constitution. Defendant argues that there has not been a direct appropriation of plaintiff's property, that is, plaintiff's contractual rights under its agreement with Erie, nor has defendant received any benefit of plaintiff's contract. In other words, defendant claims that while plaintiff's contract may have come to an end as a consequence of the taking of the railroad properties which were the subject matter of plaintiff's contract, defendant did not appropriate the contract itself.

In the following opinion, we begin with a brief discussion of the RRRA and the Supreme Court's related opinion, *Regional Rail Reorganization Act Cases*[6] (*RRRA Cases*). We focus on the RRRA's provisions and how they apply to the transfer of the railroads' properties. We then consider plaintiff's contract claim and hold that a contract here, if any, must be with Conrail, an entity over which we do not have jurisdiction. Finally, we consider plaintiff's claim that defendant's actions resulted in a taking of plaintiff's property. We find that plaintiff's contract was affected in a manner for which the RRRA did not provide. We therefore examine plaintiff's claim outside the act and hold that no compensable taking of plaintiff's property took place.

II.

This case presents a facet of the RRRA which was not directly addressed in the

---

4. *T.O.F.C., Inc. v. Erie L. Ry.*, 643 F.2d 1227, 1229 (6th Cir. 1981).

5. *T.O.F.C., INc. v. United States,* Ct.Cl., No. 207 81C (order entered Oct. 23, 1981).

6. *Regional Rail Reorganization Act Cases, Blanchette v. Conn. General Ins. Corp.,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

Supreme Court opinion in *RRRA Cases.* In that opinion, the Supreme Court upheld the constitutionality of the RRRA, which had been called into question because the RRRA contains a set dollar amount fund for the reimbursement of all takings under the fifth amendment which occurred when the private railroads were transferred to Conrail.

The Supreme Court's analysis began with an examination of the workings of the RRRA. Basically the process involved three steps. First, each district court which had jurisdiction over an included bankrupt railroad was required to determine whether that railroad could be viable outside the consolidation of the railroads. Second, the United States Railway Association (association) was established as a Government corporation. The association was required to prepare a "Final System Plan" for the creation of a financially self-sustaining rail system.[7] The railroads in the system were then transferred to a private state-incorporated corporation, Conrail, for certain Conrail securities and up to $500 million of association obligations guaranteed by the United States.[8] Finally, the Special Court, which was given exclusive jurisdiction over all "proceedings with respect to the final system plan,"[9] would order the transfer of the railroads to Conrail and determine the allocation of the available funds to the estates of the railroads. The funds, as stated above, are, however, limited to $1.5 billion worth of association obligations,[10] and the Special Court is not empowered to enter judgment against the United States.[11]

In *RRRA Cases,* the Supreme Court held that the Tucker Act[12] was available to parties with interests in the bankrupt railroads

for recovering any deficiency in compensation mandated by the fifth amendment's taking clause for the transferred properties. The Court relied on its general rule that if " * * * the authorized action * * * does constitute a taking of property for which there must be just compensation under the Fifth Amendment, the Government has impliedly promised to pay that compensation and has afforded a remedy for its recovery by a suit in the Court of Claims."[13]

Therefore, it is clear that in cases where the Special Court allocates compensation to the estates of the bankrupt railroads, the railroads' creditors, shareholders, and other interested parties, in the right set of circumstances, will be able to sue in this court for a determination whether the value given by the Government is equal to the value of the property taken, as dictated by the fifth amendment. However, we find that the present case is outside of that procedure.

In this case, the bankruptcy estate of the relevant railroad, Erie, was held free from any claims by plaintiff. Therefore, while normally a party such as plaintiff would receive a portion of the fund allocated by the Special Court to Erie, plaintiff here is not so entitled. Accordingly, plaintiff is left with the option of suing on its own to recover what it claims to be the losses it has suffered by Conrail's refusal to assume Erie's obligations under the agreement with plaintiff.

Our discussion begins with plaintiff's contractual claim. It is clear that the only party against which plaintiff has a possible claim under this theory is Conrail. Conrail is the only entity which has acted in any

---

7. 45 U.S.C. § 712 (1976).

8. 45 U.S.C. § 716(d)(2) (1976).

9. 45 U.S.C. § 719(b) (1976).

10. 45 U.S.C. § 720 (1976).

11. 45 U.S.C. § 743 (1976 & Supp. III 1979).

12. The Tucker Act, 28 U.S.C. § 1491 (1976), provides, in part:
"The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. * * *"

13. *Regional Rail Reorganization Act Cases,* 419 U.S. at 126–27, 95 S.Ct. at 349-50 (quoting *Yearsley v. Ross Constr. Co.,* 309 U.S. 18, 21, 60 S.Ct. 413, 414, 84 L.Ed. 554 (1940)).

manner that arguably could have created an express or implied-in-fact contract with plaintiff, the only types of contracts over which we have jurisdiction. Therefore, the first issue we address is whether a suit against Conrail falls within our jurisdiction. We hold that it does not.

■ In order to come within the court's jurisdiction over contracts, a party must demonstrate that the contracting entity is either the United States itself, or "among those subsidiary instrumentalities for whose actions the United States, as principal, has renounced its *own* immunity." [14] (Emphasis in original.) We, therefore, must examine the intent of the United States and determine whether the Government has renounced its sovereign immunity for actions taken by Conrail.

■ In the present case the inquiry whether Conrail can be sued in this court begins and ends with an examination of section 741(b) of title 45.[15] That section states:

(b) Status.—The Corporation shall be a for-profit corporation established under the laws of a State and *shall not be an agency or instrumentality of the Federal Government.* The Corporation shall be deemed a common carrier by railroad under section 1(3) of * * * [Title 49], shall be subject to the provisions of this Act and, to the extent not inconsistent with such Acts, shall be subject to applicable State law. * * * [Emphasis supplied.]

Congress could not have made clearer its intention to have Conrail not be considered a federal governmental entity. Furthermore, it cannot be argued that Conrail performs functions which are by their nature governmental,[16] or, in other words, "doing work of the government." [17] As the Supreme Court stated in *RRRA Cases*, "Conrail will be basically a private, not a governmental, enterprise." [18] An examination of the membership of the board of directors, which is selected by the holders of Conrail debentures and stocks, or of Conrail's power to enter areas of endeavor outside of transportation after its indebtedness to the United States is reduced, or of its ability to issue stock and debentures, leaves no doubt that Conrail is totally separate from the United States and cannot be sued in this court.

III.

■ We turn now to plaintiff's claim that the acts of defendant constitute a taking of plaintiff's property which violates the taking clause of the fifth amendment to the Constitution. This claim, in and of itself, raises no question as to our jurisdiction since the fifth amendment is an express waiver of sovereign immunity. Furthermore, the Supreme Court's holding in *RRRA Cases* removes any question whether we have jurisdiction over a determination of the adequacy of compensation given by defendant for takings which resulted from implementation of the act's provisions.

The problem raised in the instant case is that the analysis in *RRRA Cases* is based upon the "normal" outcome of a transfer of a bankrupt railroad's properties to Conrail. The normal outcome is, as stated above, that the funds made available for compensation to the stockholders and creditors of each railroad would be distributed by the Special Court to the bankruptcy estate of the applicable railroad and then be passed on to those determined by the bankruptcy courts to be entitled to the proceeds of the estate. In the present case, the bankruptcy court has determined, for the reasons stated above, that plaintiff is not entitled to any portion of the Erie estate. Therefore, we must decide whether plaintiff has a taking claim against defendant separate from the Erie estate.

**14.** *Butz Eng'g Corp. v. United States*, 204 Ct. Cl. 561, 567, 499 F.2d 619, 622 (1974).

**15.** 45 U.S.C. § 741(b)(1976).

**16.** *Cf. Chas. H. Tompkins Co. v. United States*, Ct. Cl. No. 480–81C (order entered Mar. 5, 1982).

**17.** *National State Bank v. United States*, 174 Ct. Cl. 872, 879, 357 F.2d 704, 708 (1966).

**18.** *Regional Rail Reorganization Act Cases*, 419 U.S. at 152, 95 S.Ct. at 363.

Both parties focus their arguments on what the RRRA, as interpreted by *RRRA Cases*, allows plaintiff to recover. However, both parties miss the point of the Supreme Court opinion. In *RRRA Cases*, the Supreme Court held only that parties who had their property taken by the Government under the authority granted by the RRRA would be able to come to this court if, as the Court framed the issue, "the consideration exchanged upon final conveyance of the rail properties is less than the constitutional minimum." [19] Because other courts will rule before us on the adequacy of the compensation given to parties who had their property taken, it seems clear that the doctrines of res judicata and collateral estoppel will limit our review to those cases which would arise in the unlikely event that the fund allocated by Congress for the aggregate compensation is depleted before all injured parties have been fully reimbursed.[20] But, as opposed to what the parties argue, neither the Court nor the RRRA altered what constitutes a compensable taking under the fifth amendment.

Before proceeding we reiterate where plaintiff stands in relation to our jurisdiction in this area. If, as plaintiff argues at one point in its brief, its agreement with Erie was a lease or contract which was assumed by Conrail under the provisions of the RRRA, plaintiff's action must be instituted in another court since we do not have jurisdiction over suits against Conrail. On the other hand, if plaintiff's agreement was taken under the RRRA, plaintiff must go first to the Special Court for a determination whether it is entitled to a share of the fund Congress created for takings directly resulting from implementation of the RRRA. As we stated in our earlier order in this case, the Railroad Revitalization and Regulatory Reform Act of 1976 [21] requires that we stay any action in this court "until the Special Court has ordered the distribution of the securities and the certificates of value and compensation" pursuant to the act.[22] If plaintiff's claims fall within either of the characterizations above, we cannot, at least at the present, act on those claims. Our statements above as to those characterizations should only be read as passing on the issue of our jurisdiction over plaintiff's claims and not as any indication as to their merits. It is, however, our opinion that if there has been a taking, it is outside the intended scope of the RRRA. We, therefore, consider whether the enforcement of the RRRA resulted in a taking of plaintiff's property, *i.e.*, its contract rights.

The agreement between plaintiff and Erie was for a joint venture to construct and maintain certain railroad terminal facilities. All of the land upon which the facilities were constructed was owned or leased by Erie. Plaintiff had no lien on any of the properties. In article fifth of the agreement, plaintiff was given the exclusive right to operate the facilities. In article seventh, the key article, Erie agreed to pay plaintiff $0.75 per revenue motor common carrier trailer handled at the facilities for as long, not to exceed 15 years from the operation date, as was necessary to repay plaintiff the $300,000 it originally invested in the enterprise. However, if at the end of the 15-year period plaintiff had received less than $300,000, plus a certain sum of related interest, Erie was not obligated to make any further payments. Article seventh concluded with certain adjustments and credits between the parties for certain stated contingencies and defined a "revenue motor common carrier trailer" as being a

---

**19.** *Regional Rail Reorganization Act Cases*, 419 U.S. at 147, 95 S.Ct. at 360.

**20.** The Supreme Court came to this same result when it stated:

"* * * If * * * the consideration exchanged for the rail properties should prove to be less than the constitutional minimum, the Tucker Act will be available as the jurisdictional basis for a suit in the Court of Claims for a cash

award to cover any constitutional shortfall." *Regional Rail Reorganization Act Cases*, 419 U.S. at 148, 95 S.Ct. at 361.

**21.** Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L.No.94–210, 90 Stat. 31.

**22.** S.Rep.No.595, 94th Cong., 2d Sess. 205, *reprinted in* 1976 U.S.Code Cong. & Ad.News 148, 220.

trailer which has or will earn revenue for Erie. Article tenth contained an assignment clause. The agreement's June 2, 1961, supplement did not alter the agreement in any way relevant to the present case.

The central fact in this case is that what defendant took—the land and the facilities which were contained on it—was owned by Erie and not plaintiff. The agreement held by plaintiff is in essence a service contract with Erie to operate the facilities. The payments plaintiff made to Erie were to secure an exclusive right to operate the terminals.

Defendant argues, and we now hold, that the Supreme Court opinion in *Omnia Commercial Co. v. United States*,[23] provides the controlling principles in this case. *Omnia* concerned a plaintiff's claim that when the United States requisitioned the entire production of a steel company, with which the plaintiff there had a contract for a significant portion of that company's production, a taking of that plaintiff's contract resulted. The plaintiff claimed damages of $990,000, the value of the equipment that the plaintiff there advanced to the steel company in order to aid the company in production of the steel in question. The contract between the plaintiff and the steel company gave the plaintiff below market prices for the steel and an unusually favorable timetable for delivery of the steel as consideration for the plaintiff's advancement of funds. The Court held that "for consequential loss or injury resulting from lawful governmental action, the law affords no remedy"[24] and, therefore, the plaintiff was not entitled to any damages.

*Omnia* reached the Supreme Court on appeal from this court. In its opinion,[25] this court held that:

> According to the allegations of the petition the United States took the property of the Allegheny Steel Corporation; they took from the plaintiff no tangible property. There was no privity between the plaintiff and the United States. The plaintiff had a contract with the Allegheny Steel Company for the future delivery of its product to the plaintiff. The fact that the United States in the progress of its prosecution of the war in which it was then engaged took the products of the Allegheny Company, and thereby prevented its fulfilling its contract with the plaintiff, does not give the plaintiff any claim against the Government.

The court's rationale also applies to the facts in the present case, *i.e.*, defendant took from plaintiff no tangible property. There was no privity between plaintiff and defendant. Plaintiff had a contract with Erie for the future delivery of services to Erie. The fact that defendant in the process of consolidating private bankrupt railroads took the facilities of Erie, and thereby prevented its fulfilling its contract with plaintiff, does not give plaintiff any claim against defendant.

The fifth amendment's just compensation clause refers only to a direct appropriation of property, not to consequential injuries which result from the exercise of lawful power.[26] This principle was applied in *Hooten v. United States*[27] to a fact pattern which is identical, for legal analysis purposes, to the present case. In *Hooten*, the plaintiff had management contracts with the owners of four tenement properties. The plaintiff there claimed that when the United States condemned the four properties it also took the plaintiff's interest in the management contracts and that he was, therefore, entitled to compensation for the taking. The court denied the plaintiff's claim and held that " 'settled rules of law' precluded a consideration of 'consequential

**23.** *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

**24.** *Id.* at 510, 43 S.Ct. at 438.

**25.** *Omnia Commercial Co. v. United States*, 56 Ct. Cl. 392, 394 (1921), *aff'd*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

**26.** *See Louisville & N. R. R. v. Mottley*, 219 U.S. 467, 484, 31 S.Ct. 265, 271, 55 L.Ed. 297 (1911).

**27.** *Hooten v. United States*, 405 F.2d 1167 (5th Cir. 1969).

damages' for losses of a business or its destruction."[28] These rules also apply to plaintiff's claim that it is entitled to compensation and, therefore, that claim must be denied.

The court concludes, without hearing argument, that we do not have jurisdiction over plaintiff's contract claim and that the actions by defendant did not result in a taking of plaintiff's property which is compensable under the fifth amendment. Defendant's motion to dismiss is granted, and the petition is dismissed.