292 F.2d 274
 Josef BEST, D/B/A Firm Josef Best
v.
UNITED STATES.
A. DIEHL, D/B/A Firm A. Diehl
v.
UNITED STATES.
A. HOELLEIN, D/B/A Firm A. Hoellein GMBH
v.
UNITED STATES.
August FABER, D/B/A Construction Firm, Faber & Schnepp
v.
UNITED STATES.
Julius BERGER
v.
UNITED STATES.
MUELLER-ALTVATTER COMPANY
v.
UNITED STATES.
 No. 394-59.
 No. 461-59.
 No. 11-60.
 No. 12-60.
 No. 18-60.
 No. 106-60.
 United States Court of Claims.
 July 19, 1961.
 Rehearing Denied October 4, 1961.
 
 Bernard J. Gallagher, Washington, D. C., for plaintiff in 106-60.
 Hyman J. Cohen, Washington, D. C., for remaining plaintiffs. Potter & Lancian, Frankfort, Germany, were on the briefs.
 George S. Leonard, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant. Kendall M. Barnes and Bruno A. Ristau, Washington, D. C., were on the briefs.
 MADDEN, Judge.
 
 
 1
 These cases involve, so far as the Government's motion is concerned, the same legal questions, and this opinion will cover all of them. The word "plaintiff" in this opinion will refer to the plaintiff Josef Best. The facts of the Josef Best transaction will be used as the basis of this opinion.
 
 
 2
 The question at issue is whether the United States Army in Germany, in the dealings with the plaintiff, a German in the construction business, was making a contract on behalf of the United States, as the plaintiff claims, or was, as the Government claims, exercising the authority of an occupying power to requisition needed supplies and services from the population of the occupied territory.
 
 
 3
 In 1953 the Army desired to have built an ammunition storage area in a forest near Koeppern, Germany. It caused plans and specifications to be prepared by a German firm, which was to be the architect-engineer of the project. The Army solicited bids from 12 contractors in the Koeppern area. When the bids were opened, the Army decided that they were all too high, and withdrew the project from consideration. Later, the Army, through newspaper advertising, solicited bids from contractors outside the area of Koeppern. The plaintiff, Josef Best, was the successful bidder, and he was so notified. Thereupon a "Requisition Order-Demand" was served upon him. No copy of this document has been supplied to the court. We assume that it described the work which had been specified in the invitation to bid, and named the price, DM (Deutsche Mark) 973,008, which the plaintiff had bid.
 
 
 4
 The plaintiff went to work on the project. He says that tree cutting which was supposed to have been done by others had not been done; that there were some 1,900 more trees for the plaintiff to cut than had been represented in the Government's invitation; that much more excavation and filling were required than had been estimated by the Architect-Engineer; that rainfall 260 percent in excess of the 40-year average aggravated the plaintiff's difficulties, making transportation difficult and requiring the employment of extra help; that as a result of the foregoing the plaintiff and his subcontractors incurred large extra costs.
 
 
 5
 The project was completed on October 10, 1953. The project completion date was August 28, 1953, and liquidated damages in the sum of DM 85,760.15 were assessed against the plaintiff. The plaintiff's asserted extra costs, plus the liquidated damages, amounted to DM 962,174.09.
 
 
 6
 After the completion of the project, the plaintiff went bankrupt. The receiver asserted a claim for extra costs and for the remission of the liquidated damages. The Army denied the claim and advised the receiver of his right to appeal to the Board of Requisition Demand Appeals, U.S. Army, Heidelberg, Germany. The receiver appealed to that Board. The Board referred the claim back to the claims section of the Army for a further attempt at settlement. The claims officer filed a report, dated August 30, 1955, which was favorable to the plaintiff. At a conference on September 6, 1955 between the plaintiff, the Army claims officer, representatives of the Army Audit Agency, the Engineer division, the Judge Advocate Division, and a Claims Examiner, it was determined that a payment of DM 900,000 would be fair and just, if the amount were paid at once.
 
 
 7
 Thereupon the claims officer and the Chief of the Procurement Branch recommended the payment of DM 900,000 on the appeal. Lt. Col. Fleischman, acting for Headquarters USAREUR (U.S. Army European Command), refused to make the payment. The claim then went back to the Appeals Board, on which Lt. Col. Fleischman sat, and the Board awarded the plaintiff DM 109,262.41, which amount was paid.
 
 
 8
 The plaintiff filed a claim with the General Accounting Office in 1957, which claim was denied. The instant suit is for DM 938,671.83, or $234,667.96.
 
 
 9
 The foregoing recital might appear to show a normal case of the Army having let a contract for construction; the contractor having encountered difficulties and having done extra work; the Army administrative appellate authorities having approved a small part of the contractor's claim and denied the rest of it; and a suit by the contractor in this court asserting that he was not bound by the administrative decision and was entitled to recover more.
 
 
 10
 As we have seen, the Government, in its present motion, takes the position that the transaction between the Army and the plaintiff was not a contract at all, but a lawful requisition of labor and materials from the population of a defeated and occupied country. The Government also urges other defenses.
 
 
 11
 The unconditional surrender of the armed forces of Germany to the Allied Powers occurred on May 8, 1945. The Allied Powers, in the "Declaration of Berlin" on June 5, 1945, declared, among many other things:
 
 
 12
 "The Governments of the United States of America, the Union of Soviet Socialist Republics and the United Kingdom, and the Provisional Government of the French Republic, hereby assume supreme authority with respect to Germany, including all the powers possessed by the German Government, the High Command and any state, municipal, or local government or authority."
 
 
 13
 For the purposes of the military occupation, Germany was divided into four zones, each of the four Allied Powers having primary authority and responsibility in its zone of occupation.
 
 
 14
 In the "Potsdam Protocol" of August 1, 1945, of the Allied Powers, it was declared, relative to the economic control of Germany:
 
 
 15
 "15. Allied controls shall be imposed upon the German economy, but only to the extent necessary
 
 
 16
 * * * * *
 
 
 17
 "(b) to assure the production and maintenance of goods and services required to meet the needs of the occupying forces * * * in Germany."
 
 
 18
 The Allied Powers established the "Control Council," consisting of the supreme military commanders in Germany of the armies of the four Allied Powers, as the government of Germany. The Control Council government was a military government.
 
 
 19
 On September 20, 1945, the Allied Governments imposed "additional requirements" on Germany, including the following ones:
 
 
 20
 "20. The German authorities will supply free of cost such German currency as the Allied Representatives may require, and will withdraw and redeem in German currency, within such time limits and on such terms as the Allied Representatives may specify, all holdings in German territory of currencies issued by the Allied Representatives during military operations or occupation, and will hand over the currencies so withdrawn free of cost to the Allied Representatives.
 
 
 21
 "21. The German authorities will comply with all such directions as may be issued by the Allied Representatives for defraying the costs of the provisioning, maintenance, pay, accommodation and transport of the forces and agencies stationed in Germany by authority of the Allied Representative, the costs of executing the requirements of unconditional surrender, and payment for any relief in whatever form it may be provided by the United Nations."
 
 
 22
 During the early years of the occupation of Germany, the Allied Powers permitted local German governmental units to be established, and to carry on much of the day-to-day business of government. These German activities were subject to the control of the Allied military authorities. By 1949 the rehabilitation of the three western zones of occupation had reached the point where it was feasible to permit the establishment of a provisional German government in those zones. By this time the Soviet Union was no longer cooperating with the Western Allies. In 1949 the United States, the United Kingdom and France agreed on the principles on which the future Allied control of Germany should be based; the extent to which the Allied Powers should relax their controls and transfer them to a German government; and the procedures by which the Allied Powers would exercise the controls which they retained.
 
 
 23
 Under the proposed new arrangement, instead of the Control Council, consisting of the four supreme military commanders, there should be an Allied High Commission, consisting of a High Commissioner from each of the three Western Allies, the Allied High Commission to be the supreme Allied agency of control of Germany. The German government was to have the power to take administrative and legislative action which should be valid unless disapproved by Allied authorities.
 
 
 24
 The arrangements described above were embodied in an "Occupation Statute", approved by the Western Allies. Before the statute went into effect, the Western Allies merged their zones of occupation in order to establish a tripartite administration of those zones, which administration should take effect upon the establishment of a provisional German government for the western zones of Germany.
 
 
 25
 The general functions of the Allied High Commission were to "`exercise control over the Federal Government and the Governments of the constituent Laender [States] provided in the Occupation Statute. * * * [Its] decisions shall constitute a joint exercise of the authority of all the three High Commissioners."
 
 
 26
 One of the functions of the High Commission, under the Occupation Statute, was to submit to the German authorities annually a consolidated budget of the occupation authorities covering all allied occupation expenses which Germany was required to meet.
 
 
 27
 By Executive Order of the President of the United States, the office of United States High Commissioner for Germany was created. The High Commissioner was to be "the supreme United States authority in Germany" and "the United States Military Governor under all international agreements" until such time as the Military Government of the American Zone of Germany should have been terminated.
 
 
 28
 In September 1949, the Federal Republic of Germany was established and the Occupation Statute was proclaimed by the western allies to be in force.
 
 
 29
 The Occupation Statute contained the following provision:
 
 
 30
 "2. In order to ensure the accomplishment of the basic purposes of the occupation, powers in the following fields are specifically reserved, including the right to request and verify information and statistics needed by the occupation authorities:
 
 
 31
 * * * * *
 
 
 32
 "(e) Protection, prestige, and security of Allied forces, dependents, employees, and representatives, their immunities and satisfaction of occupation costs and their other requirements; * * *."
 
 
 33
 Increased tension between the Western Allies and the Soviet Union made it necessary, in the opinion of the Western Allies, to improve the defense facilities in the Federal Republic. The ammunition storage area upon which the plaintiff worked in 1953 was an item in that program in the American zone. The German contractors who worked on such projects were paid by being given payment orders directed to the appropriate West German finance agency, for payment out of the funds, supplied by the German Government to the High Commission for occupation costs, and allocated by the High Commission, an appropriate share to the Allied authorities in each of the western zones. The defense facilities constructed under this program were to be turned over to the Federal Republic when the Western Allies withdrew their forces from Germany.
 
 
 34
 The "Requisition Order-Demand" which was given to the plaintiff when his bid was found to be the lowest bid was EC Form 6GA. This document was explained in Circular No. 75 issued by Headquarters U.S. Army, Europe, on September 3, 1952. Circular No. 75 said, about EC Form 6GA:
 
 
 35
 "(3) The form is not considered a contract since the US forces do not recognize the creation of legally enforceable contracts as the result of requisition transactions in Germany. Procurement agencies will, in all instances, insure that suppliers working on orders for the US forces receive a fair value for services or supplies rendered."
 
 
 36
 From the Engineer Division of the same Headquarters there was issued on October 1, 1953, Engineer Bulletin No. 5. In its paragraph 23 it said:
 
 
 37
 "The serving of a Requisition Demand (EC Form 6GA) constitutes an order under international and U.S. law and will in no way be construed as a contract."
 
 
 38
 The bulletin went on to say that any disobedience on the part of the German firm or of German government agencies, of a Requisition-Demand would not be tolerated by the United States military authorities. It said that Law No. 14 of the Allied High Commission might be invoked, and prosecution in the United States Courts of the Allied High Commission for Germany might follow.
 
 
 39
 In an agreement between the Allied High Commissioners on the Deutsche Mark budget for occupation costs and mandatory expenditures, quoted in a note by the Secretariat of the High Commission, dated 25 April 1950, there were listed, in the High Commission's definition of Mandatory Expenditures "which are incurred in German currency under the direct financial and administrative control of the Occupation Forces and Authorities":
 
 
 40
 "* * * expenditures for new plant, installations and structures of a permanent nature or for reconstruction of plants, installations and structures."
 
 
 41
 The standard "Invitation for Proposals (construction work)" presumably the form sent to the plaintiff, and upon the basis of which he made his successful bid, contained these paragraphs:
 
 
 42
 "12. a. When the proposal submitted by a firm satisfied the US Military Authorities, a Requisition Demand (EC Form 6GA) will be served on the firm submitting said proposal. In all cases, the firm will submit to the US Military Procurement Officer a receipt in writing stating the date of which the EC Form 6GA was delivered.
 
 
 43
 "b. The serving of EC Form 6GA with attached Requirements of Work will not constitute a contract under US, International, or German law. * * *"
 
 
 44
 A standard form of writing to be attached to and become a part of EC Form 6GA, the Requisition Demand, and presumably attached to the Requisition Demand served upon the plaintiff, contained this paragraph:
 
 
 45
 "(d) The EC Form 6GA with the attached Requirements of Work inclosed thereto will in no way be construed as a contract but is a Requisition Demand under provisions of US and International Law."
 
 
 46
 Any German contractor who had lived through the postwar years after the unconditional surrender of Germany could not have failed to be familiar with the practice of the occupying forces of buying goods or ordering services and giving the supplier an order on the Burgemeister or other appropriate German official who was obliged to pay for them because that was the law, the law laid down by the victorious military authorities. By 1953, a much greater degree of law and order had been established, and the German money to pay occupation costs was budgeted and allocated to the zonal authorities in a systematic way. However, any intelligent person knew that the Federal Republic of Germany was still paying occupation costs to the victorious Allies, though at the same time the United States, at least, was pouring billions of dollars into Germany, under the Marshall plan, to rebuild the German economy. The plaintiff could not, in the face of the repeated express statements in the pertinent documents that the transaction into which he was entering was not a contract, have expected to have the rights which would flow from the making of a contract.
 
 
 47
 The United States Army invited bids, awarded the work to the lowest responsible bidder, imposed a provision for liquidated damages for late completion, provided for additional compensation, in certain circumstances, for extra work, and provided an appeal procedure if the plaintiff was not satisfied with the lower echelon decision, all in the same way that the Army would have done if the construction had been in the United States. But the Army did not intend to make a contract which would obligate the United States, it repeatedly warned the plaintiff that it was not doing so, and it would have had had no authority to do so if it had tried. The United States Army in Germany, in the relation involved in this case, was an agency of the Allied High Commission for Germany, an international body with no capacity to sue or be sued.
 
 
 48
 The plaintiff, then, has no right based upon a contract with the United States because he had no contract with the United States.
 
 
 49
 The plaintiff asserts, in the alternative, that he has a claim founded upon the Constitution, for the taking of his property without payment to him of just compensation. It would be difficult to construct a taking of property out of a failure to cause trees to be cut by another enterpriser in preparation for the plaintiff's work, or out of the fact that the rainfall was 260 percent above average, and the plaintiff's equipment got stuck in the mud, or out of the fact that the plaintiff was late in completing his work, and the Army refused to waive the stipulated liquidated damages. But even if a taking could be constructed out of any of these facts, the taking was not done by the United States, but by the Allied High Commission for Germany.
 
 
 50
 The Government urges that the Constitution's protections do not extend to an alien such as the plaintiff, for acts of the United States in a foreign country. It is obvious from the above discussion that we do not reach the Constitutional question.
 
 
 51
 It will be remembered that the plaintiff has been paid, by German fiscal officers upon orders from the United States Army, the contract price of his work. He made claim for an additional amount, almost equal to the original contract price, on account of extras, unexpected difficulties, etc. The lower echelons of the Army recommended that he be paid DM 900,000 more. The Appeal Board provided for in the Requisition Order cut that award down to DM 109,262.41. If the transaction had been in the United States, and if the plaintiff's claim had had merit, in whole or in an amount larger than he received, and if he had been able to convince this court that the Army had been arbitrary or capricious, or that its decision was not supported by substantial evidence, he would have received our judgment.
 
 
 52
 The plaintiff's situation is that the German government was obligated to pay, upon order of the United States Army. The Army has refused to give the order. The German government has not, then, defaulted under its duties imposed by the Occupation Statute, and the United States has no basis for complaining that Germany has not paid the plaintiff on a claim which the United States Army, acting as the agent of the Allied High Commission, held to be without merit.
 
 
 53
 The Government in its brief quotes a communication, dated August 30, 1960, from the Department of State to the Department of Justice saying that it has complained to the Federal Republic of Germany because a cited convention between the two countries
 
 
 54
 "places an obligation on the Federal Republic of Germany to see to it that persons subject to its jurisdiction do not assert claims of the character represented by these [the plaintiffs'] suits and * * * the filing of the foregoing cases is, therefore, contrary to the provisions of the [convention]."
 
 
 55
 It is interesting to speculate as to what the German government might be expected to do to satisfy the complaint of the United States. For one thing, it could pay the plaintiff the money which the United States Army held that he did not deserve. For another thing, if it had provided itself with a statute making it a crime to prosecute a lawsuit against a friendly country, in violation of a treaty, it could enforce that statute. We are aware of no such statute in the United States, nor in Germany, but we do not assume to speak advisedly.
 
 
 56
 It would seem that the plaintiff's only hope of a satisfactory emergence from his position of having fallen between two stools would be to persuade his government that the United States Army's refusal to order that government to pay him was inequitable.
 
 
 57
 The defendant's motion for summary judgment is granted and the plaintiffs' petitions will be dismissed.
 
 
 58
 It is so ordered.
 
 
 59
 JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.