**Rose Marie PORTER et al.**

v.

**The UNITED STATES.**

**No. 111–73.**

United States Court of Claims.
May 15, 1974.

584

John P. Meade, Washington, D. C., attorney of record for plaintiffs.

Gerald L. Schrader, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

KUNZIG, Judge:

The court is confronted in this case with a jurisdictional question of first impression: is the United States subject to suit (1) for alleged breach of a contract negotiated by officials serving in the capacity of administrators for the United States Pacific Islands Trust Territory, or (2) for an alleged taking of property arising from actions by such officials pursuant to that contract? We conclude that the court lacks jurisdiction over either of these claims. Accordingly, we dismiss the petition.

Plaintiffs are sixteen named shareholders in Transpacific Lines, Inc. (Transpacific), a corporation chartered by the Government of the Trust Territory of the Pacific Islands (Trust Territory).[1] Their suit for recovery of financial losses incurred by their enter-

prise derives from the following factual background.

On March 18, 1968, the Office of the Trust Territory High Commissioner issued a press release headlined "Trust Territory Invites Shipping Proposals." The release stated in part:

> The Government of the Trust Territory of the Pacific Islands is seeking proposals for a 10-year sea transportation contract. In addition to providing direct service from the U.S. west coast the contractor would be called upon to service the Trust Territory's six scattered districts * * *. The Territory is administered by the United States under a United Nations trusteeship agreement.

Subsequently, a "Solicitation for Proposals for Trust Territory of the Pacific Islands Sea Transportation Services" was issued. This directed interested parties to submit proposals to the High Commissioner of the Territory, together with a copy to the Director of the Office of Territories, United States Department of the Interior (Interior), by May 15, 1968. Timely proposals were received at these offices from Marine Chartering Company (Marine), a California corporation, and several other enterprises. In July 1968, Robert E. Vaughn, Deputy Assistant Secretary of the Interior, invited representatives of bidding parties to meet with a review panel at Interior to discuss the proposals. Following this meeting, attended by Marine's president, the panel concluded Marine had presented the best proposal.

Negotiations resulted in an agreement entered into on August 1, 1968. The agreement's preamble recited that it was "by and between the Government of the Trust Territory * * * and Marine Chartering Company, Inc." The signature block again identified the contract-

---

1. The Trust Territory is comprised of 2,141 islands covering an area of approximately 3,000,000 square miles in the southwest Pacific. Three island chains—the Marianas, Marshalls, and Carolines—make up the region of over 92,000 inhabitants popularly referred to as Micronesia. Administratively, the territory is divided into six districts, with a capital at Saipan in the Mariana chain.

ing parties as the Trust Territory government and Marine.

By article XVIII of the agreement, Marine was required to transfer and assign the agreement within six months to Micronesia Interoceans Line, Inc. (MILI), which was to be organized and capitalized by Marine with substantial participation by citizens of the Trust Territory. The article also provided that, during the contract's tenure, "the Carrier shall operate the Vessels under the flag of the Trust Territory * * *." On August 8, 1968, articles of incorporation were filed for MILI with the Registrar of Corporations in Saipan. MILI's principal office and place of business were listed as Saipan. The agreement was thereupon transferred and assigned to MILI.

On September 22, 1971, Barclays Bank of San Francisco informed the Trust Territory government that MILI would not be extending a $500,000 letter of credit which it had opened in the Trust Territory government's favor, and that the letter would expire in two days. The Trust Territory was already concerned with numerous other alleged performance deficiencies on MILI's part, and on September 29, 1971 notified the corporation of its intention to terminate for default as authorized by article XX of the agreement.

After meetings between the president of Marine, which still owned substantial shares of MILI, and the Trust Territory attorney general, an agreement was signed by the Territory's High Commissioner and by representatives of MILI. The agreement inter alia withdrew notice of default, suspended article XXVI (which required Marine to furnish a $500,000 performance bond), and set up

2. The parties' briefs present a less than clear-cut scenario of the specifics of plaintiffs' claims. Because the present posture of the case does not require the court to reach the merits, however, we do not pause over this shortcoming.

a trust for certain MILI shares held by Marine.

On October 20, 1971, Marine, MILI and the Trust Territory attorney general became parties to a "Trust Agreement" by which the attorney general was designated trustee of the 210,000 class B shares in MILI owned by Marine. A complete divestment of Marine's stock in MILI, in consideration of the Trust Territory government withdrawing its notice of cancellation of the 1968 contract, was then accomplished. Subsequent to plaintiffs' filing of petition on March 30, 1973, on the breach and unconstitutional taking issues raised above, the corporate name of MILI was changed to Transpacific. 2

Defendant has moved for summary judgment on both issues. For the reasons which follow, we grant the motion on both issues.

### The Breach Claim

As a forum for claims against the Federal Government, a necessary antecedent to our jurisdiction is a waiver by the Government of its sovereign immunity from suit. National State Bank of Newark v. United States, 357 F.2d 704, 706, 174 Ct.Cl. 872, 876 (1966). In our general jurisdictional statute, 28 U.S.C. § 1491 (Supp. II, 1972), Congress has waived the immunity of the United States in a host of actions, including those based upon express or implied contracts.

Plaintiffs invoke this jurisdictional statute by asserting their claim arises from a contract, either express or implied, with the United States. Defendant counters that plaintiffs fail to state a claim within the court's jurisdiction since no privity of contract exists between Transpacific and the United States. We agree with defendant.3

3. Defendant also alleges that the court lacks jurisdiction because the subject matter of the claim arises from a treaty, 28 U.S.C. § 1502 (1970), and that plaintiffs lack standing to bring a "derivative" suit since their corporation is the real party in interest. Ct.

The analysis which follows deals with the relevant questions of (1) whether defendant is an express party to the subject, written contract; (2) whether defendant is a principal to the subject, written contract; (3) whether an implied contract exists between the parties.

Plaintiffs' claim is purportedly based upon the contract for sea transportation services of August 1, 1968. The United States, however, was not a party to that agreement. As recited in the preamble to the contract and again in the signature block, the parties to the agreement were the Trust Territory government and Transpacific (as successor to Marine).

■ Since defendant was not a named party contracting with Transpacific, the court can have jurisdiction over this claim only if, as a matter of law, the Trust Territory government was an agency or instrumentality of the United States acting within the scope of its authority in entering into the disputed agreement and thereby binding defendant as a principal to it. D. R. Smalley & Sons, Inc. v. United States, 372 F.2d 505, 178 Ct.Cl. 593, cert. denied, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed. 2d 97 (1967); Housing Corp. of America v. United States, 468 F.2d 922, 199 Ct.Cl. 705 (1972); Raymond Constructors of Africa, Ltd. v. United States, 411 F.2d 1227, 188 Ct.Cl. 147 (1969). Under such circumstances, the Federal Government would be considered to have waived its sovereign immunity from suit on this contract. National State Bank of Newark v. United States, *supra*, 357 F.2d at 706, 174 Ct.Cl. at 876–877.

It is therefore necessary to examine the exact nature of the relationship between the Trust Territory government and the United States. This relationship traces to World War II, when the islands of Micronesia came under United States military control with the defeat of Japan, which had held a mandate over the islands under the League of Nations. The establishment of the United Nations (U.N.) and its Trusteeship Council, with jurisdiction over non-self-governing territories, resulted in the execution of trusteeship agreements between the U. N. and those signatory powers in *de facto* possession of such territories. One such agreement, ratified by the Security Council on April 2, 1947, and approved by Congressional joint resolution on July 18, 1947, designated the United States as the "administering authority" over the Pacific Islands Trust Territory. 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N. T.S. 189.

This "bi-lateral contract" with the Security Council represented a means for the United States to reconcile its new strategic interests in the Pacific with its announced policy against self-aggrandizement as a result of the war. Trusteeship served as a workable alternative to the military departments' urgings for outright annexation of the former Japanese mandate. Note, A. Macrostudy of Micronesia: The Ending of a Trusteeship, 18 N.Y.L.F. 139, 144 (1972).

Article 3 of the trusteeship agreement provided:

> The administering authority shall have full powers of administration, legislation, and jurisdiction over the territory subject to the provisions of this agreement, and may apply to the trust territory, subject to any modifications which the administering authority may consider desirable, such of the laws of the United States as it may deem appropriate to local conditions and requirements.

Under article 4, however, the United States was obligated to discharge its trustee duties "in accordance with the Charter of the United Nations, and the provisions of this agreement," and to apply the objectives of the trusteeship system in this effort. *See* U.N. Charter arts. 75–77, 82–84. Thest broad goals

Cl. Rule 61(a). *See* Algonac Manufacturing Co. v. United States, 428 F.2d 1241, 1249, 192 Ct.Cl. 649, 662 (1970). Because of the basis on which we grant defendant's motion for summary judgment, we find it unnecessary to reach these issues.

include to "foster the development of such political institutions as are suited to the trust territory" and to "promote the economic advancement and self-sufficiency of the inhabitants." Trusteeship Agreement, art. 6, 61 Stat. 3302. Toward this end, the State Department publishes an annual report to the U.N. and U.N. observers have been allowed to conduct periodic inspections of the islands.

In entering the trusteeship agreement, the United States made clear that it did not consider its role of trustee to encompass the highest form of political authority over the islands, i. e., sovereignty. 16 Dep't State Bull. 416, 417 (1947). This unilateral disavowal of sovereignty is in accord with the accepted view of the status of the trust territories under international law. As concluded by one leading authority:

> there seems to be general concurrence with respect to the present trust territories, as there was with respect to the mandated territories, that wherever sovereignty does rest it is not in the administering power.

Sayre, Legal Problems Arising from the United Nations Trusteeship System, 42 Am.J.Int'l L. 263, 271 (1948).[4]

In undertaking administration of the trusteeship, Congress, by the Act of June 30, 1954, as amended, 48 U.S.C. § 1681 (1970), directed:

> (a) Until Congress shall further provide for the government of the Trust Territory for the Pacific Islands, all executive, legislative, and judicial authority necessary for the civil administration of the Trust Territory shall continue to be vested in such person or persons and shall be exercised in such manner and through such agency as the President of the United States may direct and authorize.

Prior to 1962, responsibility for administration of the islands was divided be-

tween Interior and the Department of the Navy. Effective July 1, 1962, the President, by Executive Order 11021, 27 Fed.Reg. 4409, redelegated his authority for civil administration of the Territory to the Secretary of the Interior to

> take such actions as may be necessary and appropriate to carry out the obligations assumed by the United States as the administering authority of the trust territory *under the terms of the trusteeship agreement and under the Charter of the United Nations* [emphasis added].

Pursuant to these obligations, the Secretary established in 1967 a Trust Territory government which included legislative, judicial, and executive branches, with the High Commissioner as chief executive of the Territory. Secretarial Order No. 2918, Dec. 27, 1968, 34 Fed. Reg. 157. The Secretary also reserved to himself or his delegate the power and authority to contract, "on behalf of the Trust Territory," for the purchase, charter, maintenance and operation of aircraft and surface vessels in the islands. Secretarial Order No. 2902, Nov. 15, 1967, 32 Fed.Reg. 16058.

While the United States has retained direct control in certain fields, such as foreign affairs, the daily administration of the islands has largely shifted into the hands of the local government. The Territory operates under its own comprehensive legal code. Inhabitants of the islands are citizens of the Territory, not of the United States.

Plaintiffs have failed to cite one case to support their view that the Trust Territory acts in an agency capacity on behalf of the United States. The case law reveals that the concept of sovereignty as concerns American outlying territories is a pliable one for purposes of resolving domestic jurisdictional dis-

---

4. Though by no means a settled point, the most persuasive view on this question is that sovereignty rests in the people of Micronesia and is held in trust for them by the administering power. *Cf.* Neely v. Henkel, 180 U.S. 109, 120, 21 S.Ct. 302, 45 L.Ed. 448 (1901); Cobb v. United States, 191 F.2d 604, 608 (9th Cir.), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952).

putes; it must be applied in the context of specific statutory terminology and legal doctrine. *See* Kawananakoa v. Polyblank, 205 U.S. 349, 353–354, 27 S.Ct. 526, 51´ L.Ed. 834 (1907); Hooven & Allison Co. v. Evatt, 324 U.S. 652, 677–679, 65 S.Ct. 870, 89 L.Ed. 1252, rehearing denied, 325 U.S. 892, 65 S.Ct. 1198, 89 L.Ed. 2004 (1945); Harris v. Boreham, 233 F.2d 110, 113–114 (3d Cir. 1956); Alig v. Trust Territory, 3 TTR 603, 609–10, 615 (1967). In the framework of several statutory schemes, however, the courts have consistently held the Trust Territory to be either a "foreign country" or something other than a "federal agency." Callas v. United States, 253 F.2d 838, 841–842 (2d Cir. 1958) (Federal Tort Claims Act not applicable to Trust Territory); People of Saipan v. Department of the Interior, 356 F.Supp. 645, 648 (D.Haw.1973) (Administrative Procedure Act and National Environmental Protection Act not applicable); Brunell v. United States, 77 F.Supp. 68, 72 (S.D.N.Y.1948) (Federal Tort Claims Act not applicable).

■ While the jurisdictional issue at hand turns on privity of contract rather than statutory construction, the Trust Territory precedents urge persuasively that the Territory government is not an agency of the United States for contract purposes. This conclusion finds authority in an opinion letter of the Comptroller General of the United States. In his opinion B–131569 of June 11, 1957, the Comptroller General held that the Trust Territory government could not utilize federal transportation request to defray official travel expenses of its employees since "none of the territorial governments, including the Government of the Trust Territory, are regarded as Federal agencies or instrumentalities." Nor is this result affected by the fact that the salaries of the High Commissioner and his subordinates are paid from federal funds. The important point here is that their positions were established as offices of the Trust Territory, not of the United States. Harris v. Boreham, *supra* at 115–116. *See also* Dudley v. Commissioner, 258 F.2d 182, 188 (3d Cir. 1958).

Moreover, the facts as a whole do not support the assertion that the Trust Territory was "doing work of the [United States] government" in entering the contract in dispute. National State Bank of Newark v. United States, *supra*, 357 F.2d at 707–708, 174 Ct.Cl. at 877–879. The contract solicitation in the instant case made it clear that the successful bidder would accept an offer by the Trust Territory government, operating as a foreign country outside the sovereignty of the United States. *Compare* Escote Manufacturing Co. v. United States, 169 F.Supp. 483, 488, 144 Ct. Cl. 452, 458–459 (1959).

Plaintiffs forcefully argue that the contract was actually negotiated in part at Interior and that *de facto* control by defendant of Trust Territory officials, and hence of the contract's performance, was maintained through the pervasive authority of the Secretary of the Interior, especially as regards shipping services for the islands. Nevertheless, the "whole bundle of controls" here described is insufficient to establish defendant's liability under the contract. Woodbury v. United States, 364 F.2d 993, 1000, 1004, 176 Ct.Cl. 838, 851–852, 858–859 (1966). The court has refused to recognize defendant as a liable principal in other cases involving more direct forms of control over the contract's performance. Housing Corp. of America v. United States, *supra*, 468 F.2d at 924, 199 Ct.Cl. at 710; D. R. Smalley & Sons, Inc. v. United States, *supra*, 372 F.2d at 508, 178 Ct.Cl. at 598.

In the case of Best v. United States, 292 F.2d 274, 154 Ct.Cl. 827 (1961), involving a situation analogous to that at hand, the court refused to find a contract binding on defendant. There, the U. S. Army in occupied Germany invited bids for a construction project, awarded the work to the lowest responsive bidder, imposed a provision for liquidated damages for late completion, and provided

an appeal procedure for performances disputes.

But the Army did not intend to make a contract which would obligate the United States, it repeatedly warned the plaintiff that it was not doing so, and it would have had no authority to do so if it had tried. The United States Army in Germany, in the relation involved in this case, *was an agency of the Allied High Commission for Germany, an international body with no capacity to sue or be sued* [emphasis added].

292 F.2d at 278–279, 154 Ct.Cl. at 836. We believe defendant's case is even stronger here since the contract solicitation made clear at the outset that the Trust Territory, not defendant, was the offering party.

Had plaintiffs wished to obligate defendant in the disputed undertaking, they should have sought a different drafting of the agreement. At this stage, they have failed to carry their burden of convincing the court to widen the obligation under an integrated document defendant deliberately chose not to sign. *Compare* Woodbury v. United States, *supra,* 364 F.2d at 999, 1000, 176 Ct.Cl. at 850, 852, *with* Raymond Constructors of Africa, Ltd. v. United States, *supra,* 411 F.2d at 1237, 188 Ct. Cl. 161 at 165–166. Because defendant was not a party to the agreement and the Trust Territory is not an agency or instrumentality of the United States, no express contract within the court's jurisdiction is found.

■■ Nor many an *implied* contract be inferred from the circumstances at hand. The general rule in government contract law is that a contract implied in fact [5] is one

founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing,

in the light of the surrounding circumstances, their tacit understanding. Baltimore & Ohio R.R. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923); Algonac Manufacturing Co. v. United States, 428 F.2d 1241, 1255, 192 Ct.Cl. 649, 673–674 (1970).

■ Here, there can have been no meeting of minds between the United States and plaintiffs with regard to a contractual undertaking since the responsible officers dealing with Transpacific were acting on behalf of the Trust Territory government, not the United States. This should have been clear to Transpacific, not only from the solicitation for orders, but from Secretarial Order No. 2902, 32 Fed.Reg. 16058, as amended, 33 Fed.Reg. 18201, which expressly delegated authority to the High Commissioner and the Director of the Office of Territories to contract for shipping services *"on behalf of the Trust Territory of the Pacific Islands"* [emphasis added]. As a matter of law, Transpacific had constructive, if not actual, notice of the nature of this delegation of authority, since it was published in the Federal Register. Federal Register Act, 49 Stat. 502, 44 U.S.C. § 1507 (1970); Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384–385, 68 S. Ct. 1, 92 L.Ed. 10 (1947).

■ Thus, any representation by an official of either Interior or the Trust Territory that he was acting on behalf of the United States was outside his scope of authority and the United States is not bound by such act or representation. *See* Federal Crop Insurance Corp. v. Merrill, *supra* at 384; Housing Corp. of America v. United States, *supra* 468 F.2d at 925, 199 Ct.Cl. at 711. *Compare* Thomson v. United States, 357 F. 2d 683, 688–689, 174 Ct.Cl. 780, 790–791 (1966). The totality of circumstances at bar does not warrant the court concluding that the "legal equivalent of mu-

---

5. We presume that plaintiff alleges an implied-in-*fact* contract since the court lacks jurisdiction over contracts implied in *law.* Merritt v. United States, 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925); Putnam Mills Corp. v. United States, 479 F.2d 1334, 1337 n. 3, 202 Ct.Cl. 1, 8 n. 3 (1973).

tual consent" existed between the parties with regard to the undertaking in dispute. *See* J. C. Pitman & Sons, Inc. v. United States, 317 F.2d 366, 368, 161 Ct. Cl. 701, 705 (1963).

In summary, defendant is not an express party or a principal to the subject, written contract. Nor does an implied contract exist between the parties.

■ In an effort to salvage their petition, plaintiffs assert that this court's determination that it lacks jurisdiction would leave plaintiffs without a forum in which to seek relief on the present claim. While such a result could not in itself affect this court's jurisdiction, which is statutorily defined, Kyer v. United States, 369 F.2d 714, 719, 177 Ct. Cl. 747, 754 (1966), cert. denied, 387 U. S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967), we cannot fail to observe that since September 1967 the Trust Territory government has granted "exclusive jurisdiction" to the trial division of the Territory's High Court for claims against the Territory government founded upon "any express or implied contract with the Government of the Trust Territory * * *." I Code of the Trust Territory of the Pacific Islands, § 251(1)(b) (Steincipher ed. 1970); Rivera v. Trust Territory, 4 TTR 140 (1968). Under this provision, plaintiffs would clearly have a cause of action in Trust Territory court for the present claim.

### The Taking Claim

Plaintiffs' second basis for recovery is that their private property was taken for public use by the United States through its appointees, agents, and employees without the just compensation required by the Fifth Amendment. Plaintiffs allege that certain representatives of the Trust Territory government, including its attorney general and the chief of its transportation division, coerced the president of Marine to agree to the establishment of a trust, consisting of Marine's shares in Transpacific, by threatening to cancel Transpacific's

contract with the Trust Territory for default. Plaintiffs claim that the creation of this trust effectively vested control of Transpacific in the Trust Territory government.

Defendant asserts that the Trust Territory is a foreign state and that it is an elemental principle of constitutional law that the Constitution does not extend even to territories or possessions of the United States until Congress passes an enabling act to that effect, which here has not been done. Fleming v. Page, 50 U.S. (9 How.,) 603, 13 L.Ed. 276 (1850); Hooven & Allison Co. v. Evatt, *supra*.

■ While we hold for defendant on this issue, we reject its constitutional assertions as overly rigid. The just compensation clause of the Fifth Amendment has, in fact, been applied to takings of property located outside the United States, even in the absence of Congressional extension of the Constitution to such foreign soil. Seery v. United States, 127 F.Supp. 601, 130 Ct.Cl. 481 (1955); Turney v. United States, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953); Fleming v. United States, 352 F.2d 533, 173 Ct.Cl. 426 (1965).

A key element of these precedents, however, is that each concerned an alleged taking *by the United States,* regardless of where the property was located. Thus, in the present case, just as plaintiffs had to demonstrate that the United States was directly or indirectly contracting with plaintiffs in their breach claim *supra,* here they must show the United States carried out the alleged taking of property. This they have failed to do.

■ Plaintiffs' taking claims focus only on the actions of Trust Territory officials, specifically the islands' attorney general and chief of the transportation division. As explained in detail *supra,* these officials were without authority to act on behalf of the United States. In the analogous case of Standard-Vacuum Oil Co. v. United States, 153 F.Supp. 465, 139 Ct.Cl. 113, cert. denied, 355 U. S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191

(1957), the court concluded that no unconstitutional taking, as a result of General Douglas MacArthur's actions in occupied Japan, had been alleged since the Supreme Commander had acted *on behalf of the Allied Powers* there, not of the United States.

Plaintiffs' argument finds its strongest support in the *Turney* precedent. That case involved an embargo by the independent government of the Philippines against removal from the Philippines of plaintiff's property until such time as plaintiff agreed to return certain of the property to the United States. Because the Manila government's action was prompted by "irresistable pressure" from the United States, the court held an unconstitutional taking by defendant had occurred. 115 F.Supp. at 463–464, 126 Ct.Cl. at 214. Defendant's affirmative efforts, in part through the medium of the Philippines government, to regain the disputed property was well documented in that case. The more nebulous forms of United States influence within the Trust Territory government on which plaintiffs here rely, on the other hand, are insufficient to make defendant constructively responsible for the taking alleged. *See* Best v. United States, *supra*, 292 F.2d at 279, 154 Ct.Cl. at 836; D. R. Smalley & Sons, Inc. v. United States, *supra*, 372 F.2d at 508, 178 Ct.Cl. at 599.

This result is not inconsistent with our acceptance of jurisdiction in the case of Fleming v. United States, *supra*, since the taking of property in the Trust Territory there complained of was by the United States Navy, undisputedly acting on behalf of defendant. We must conclude that the present petition fails to allege action by defendant necessary to make out an unconstitutional taking claim within our jurisdiction. As with regard to their contract claim, it seems that, if plaintiffs have any remedy for the alleged confiscation of their corporate assets, it is through civil action against the Trust Territory government for unliquidated damages in the trial division of the Territory High Court. I

Code of the Trust Territory of the Pacific Islands, § 251(1)(b) (Steincipher ed. 1970).

In summary, plaintiffs have failed to describe a claim, either for breach of contract or unconstitutional taking, within the jurisdiction of this court. Accordingly, defendant's motion for summary judgment is granted and the petition is dismissed.

NICHOLS, Judge (concurring):

I join in the opinion and judgment of the court. I had difficulty with this case and at the outset would not have decided it in the way the majority chooses. I come out now on defendant's side but it may be helpful to state the reasons why.

There is no doubt in my mind that under the United Nations trusteeship the Congress could have created a Trust Territory government that was, in fact and law, just another agency of the Federal government. Had it done so, a contract such as we have here, made as this was made, and dealing with the subject this does, could have been enforced in this court, and we could have considered and adjudicated the alleged taking also. On the other hand there is no reason deriving from the source of its legislative power, the trusteeship agreement with the U.N., why the Congress could not have set up the same kind of territorial sovereign it has traditionally set up for civil rule of territories brought under its wing in more usual ways. Our national traditions oppose the former alternative favor the latter. Nornal attributes of such territorial governments are that they do not contract or expropriate property as agents of the United States, but on their own behalf, and to enforce their liabilities, their own consent to be sued, not that of the United States must be obtained. Porto Rico v. Rosaly, y Castillo, 227 U.S. 270, 33 S.Ct. 352, 57 L.Ed.2d 507 (1913).

The enabling legislation, 48 U.S.C. § 1681, reads on its face to set up not a typical territorial government but a simple dictatorship. The President can

govern the Trust Territory in any way he pleases. The first tier delegation of authority to the Secretary of the Interior in E.O. 11021 is equally broad and sweeping. Only in the second tier, the Secretary's Departmental Order No. 2918, does the structure of a territorial government take form.

As I understand it the Royal charters setting up the American colonies in the 17th and 18th centuries did not require participation by Parliament. In our system, under our Constitution, chartering territorial governments have traditionally required the participation of the Congress. Art. IV, Sec. 3 of the Constitution seems to visualize this. The differences in the situation of a citizen or subject that depend on whether he is directly ruled from Washington, or by a territorial government, are enormous. I seriously question whether it is possible to confer the character of a territorial government upon a body of United States Government officials, with all its formidable consequences, without the participation of Congress. It would follow that language in a second tier delegation, purporting to do this, would at least fail to have the important implied and collateral results that occur when Congress itself speaks. The agency would remain an agency despite the Secretary's efforts to make it a territorial sovereign. Its contracts would be contracts of the United States.

The Congress has, however, enacted that the High Commissioner, provided for in Part II, Sec. 1 of Departmental Order No. 2918, shall be appointed by the President and confirmed by the Senate. Public Law 90–16, § 2, 81 Stat. 15, 48 U.S.C. § 1681a. The legislative history recites enough of the governmental setup under the High Commissioner to show that it all came under the scrutiny of Congress at that time (1967) and was apparently approved except for the modification indicated. Senate Report No. 62 and Conf.Rep.No.208, 90th Cong., 1st Sess., 1 U.S.Code Cong. & Administrative News, p. 1158 and ff. (1967). The following permanent code sections

also hang pendant upon the structure the Secretary fashioned. I conclude that the purported territorial government can no longer be considered an executive creation pure and simple. This way of Congressional backing into the founding of a civil government no doubt has its explanation in the legitimate interests of the State and Navy Departments in the area, as recognized by E.O. 11021. The plaintiffs herein do not come to grips with the concept of a territorial sovereign in operation here, and do not show clearly how they can recover if a territorial sovereign was in existence and was the ostensible contracting party.

For all these reasons, my initial amazement at the bald text of 48 U.S.C. § 1681 has much abated and I am now prepared to agree that the involved contract was not made by an agency of the United States. The other conclusions of the court are inescapable.