# DeMAURO CONSTRUCTION CORPORATION

v.

## The UNITED STATES.

No. 359–75.

United States Court of Claims.

Jan. 25, 1978.

---

**1324**

John H. Tracy, Vienna, Va., Atty. of record for plaintiff; Lewis, Mitchell & Moore, Vienna, Va., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before LARAMORE, Senior Judge, NICHOLS and KASHIWA, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case, which concerns the construction of the Tengan Dam in Okinawa, is before the court on cross-motions for summary judgment. Defendant contends that the court lacks jurisdiction because the suit properly should be brought by DeMauro against the government of Japan, not the government of the United States. Plaintiff argues, conversely, that it contracted with the United States. We agree with plaintiff and find that the involved contract has been breached.

To clarify the positions of the parties, we are including some background information regarding the American occupation of the Ryukyus.

From the military conquest during World War II in 1945, until May of 1972, the United States exercised full control over the Ryukyu Islands, of which Okinawa is the largest. Following their surrender, these islands were treated as separate and distinct territory for the purpose of occupation, rather than as an integral part of Japan. Unlike other occupied territories, which were administered jointly by the Allied Powers, the occupation of the Ryukyus continued under exclusive American jurisdiction under powers derived from the peace treaty with Japan, when made. After an initial period of military government, however, considerable control was returned to local institutions, and Japan's residual sovereignty was acknowledged. Executive Order No. 10713, 22 F.R. 4007, U.S. Code Cong. & Admin. News, p. 903 (1957), established a dual system of government in the Ryukyus for the duration of American occupation. The local administration consisted of the Central Government of the Ryukyu Islands, with a one-house legislature of 29 representatives elected directly by the Ryukyuans. The Order also provided a Civil Administration under the Department of Defense. The Secretary of Defense was to appoint a High Commissioner, a member of the military, under whom was organized the so-called United States Civil Administration of the Ryukyu Islands (USCAR) to aid in governing the Islands. A measure of coordination between the two administrations was accomplished by the High Commissioner's appointment, after consultation with the legislature of a Ryukyuan Chief Executive. *See generally, Rose v. McNamara,* 126 U.S.App.D.C. 179, 182–83, 375 F.2d 924, 926–27 *cert. denied,* 389 U.S. 856,

88 S.Ct. 70, 19 L.Ed.2d 121 (1967); *Burna v. United States,* 240 F.2d 720, 721 (4th Cir. 1957); *Cobb v. United States,* 191 F.2d 604, 608 (9th Cir. 1951), *cert. denied,* 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952); S.Rep.No. 674, 90th Cong., 1st Sess. (1967), U.S. Code Cong. & Admin. News 1967, p. 1767; S.Rep.No. 1738, 86th Cong., 2d Sess. (1960), U.S. Code Cong. & Admin. News 1960, p. 3067. *See also,* Executive Order No. 11010, 27 F.R. 2621, U.S. Code Cong. & Admin. News p. 4326 (1962), which updated Executive Order No. 10713.

According to Executive Order 10713, one of the principal objectives of the occupation government was to promote the economic and cultural welfare and advancement of the Ryukyu inhabitants. To facilitate this directive in part, USCAR issued Hi Com Ordinance Number 8, on September 4, 1958. This ordinance was entitled "Establishment of the Ryukyu Domestic Water Corporation." Appended to the ordinance was a charter for the Ryukyu Domestic Water Corporation (RDWC), stating that the RDWC was created as "an instrumentality of the United States Civil Administration of the Ryukyu Islands." The purpose of the RDWC was to take action to alleviate water shortages on the islands. As early as 1957, USCAR recognized the need for constructing a water system to remedy the shortage of domestic drinking water. In 1963, a "Memorandum of Understanding Concerning the Construction Incident to the Strengthening and Expansion of the Integrated Water System, Okinawa" was executed. The memorandum was signed by representatives of the RDWC and by the U.S. Corps of Engineers. Under the agreement, the Chief of Engineers for the United States Army is designated as agent for the RDWC for implementation of various water projects. The Memorandum also describes the tasks, essentially those of the procurement process, to be assigned to the Engineers.

The United States Army Corps of Engineers, issued an invitation for bids, No. 92–328–64–19. The advertisement solicited bids on the construction of the Tengan Dam and Reservoir and appurtenant work on Okinawa. On June 8, 1964, the contract was awarded to DeMauro in the lump-sum amount of $531,782. The contract, which was executed on June 26, 1964, was signed by the DeMauro Corporation, and for the United States, by Colonel H. C. Schrader of the Corps of Engineers. The document was not signed by any additional parties, nor does it anywhere refer to the existence of other parties to the contract.

This suit concerns a claim which arose, during the course of performance, out of a changed condition. The Tengan Dam was designed as an earthen dam running approximately north and south across a stream valley between points of high ground, with the upstream face to the west and the reservoir to the northwest. The central feature in the design of the actual dam was its core, which was to consist of a central structure of impervious fill. In constructing the dam, plaintiff discovered that less fill was available than had been indicated in the contract drawings. Accordingly, plaintiff sought additional compensation under the contract for a changed condition. After the claim was denied by the contracting officer, DeMauro appealed to the Armed Services Board of Contract Appeals. In a decision of November 7, 1972, the Board found that the government was liable for the changed condition, and ordered the parties to negotiate an equitable adjustment. ASBCA No. 12374, 72–2BCA ¶ 9767. If the parties could not agree on an amount to be paid to the contractor, the government was directed to make a unilateral determination, which could be appealed to the Board.

On December 22, 1972, plaintiff wrote to defendant requesting a preliminary meeting to establish negotiation procedures. Another letter, to the same effect, was sent on January 22, 1973. After several attempts were made by DeMauro to institute negotiations, the government eventually informed plaintiff that it would not negotiate because of the 1972 treaty under which the Islands reverted to Japan. Defendant contended that under the treaty the government of Japan assumed all the obligations relating to construction of the Tengan

Dam, and, therefore, the United States was no longer authorized to represent the RDWC. The government also asserted at this time that the real party to the contract was, and always had been, the RDWC. De-Mauro is now in this court seeking recovery for breach of this contract.

Defendant contends, for a number of reasons, that we do not have jurisdiction to decide this case. First, defendant asserts that it never was a true party to the agreement, but rather was acting as an agent for the RDWC, and, in this capacity, executed the contract on RDWC's behalf. Apparently, according to the government, the failure to note this fact when the contract was executed by Colonel Schrader was inadvertent. The government also contends that if it ever was obligated under the contract, it was released by a modification to the contract which was assented to by the plaintiff. Defendant further maintains that under the treaty with Japan, any obligations which might conceivably have been imputed to the United States were assumed by the government of Japan, and were thereafter the sole responsibility of the Japanese government. Finally, it is argued that the court has no jurisdiction over DeMauro's claim because no appropriated funds were ever authorized by Congress for construction of the Tengan Dam.

■ We are convinced that the United States was indeed a party to the contract with DeMauro. Again, the contract itself nowhere states that the parties are any other than those signing it, and the document is signed only by the DeMauro Company and by Colonel Schrader, an engineer with the United States Corps of Engineers. The RDWC is mentioned nowhere. To the contrary, the contract is a standard federal procurement form, specifically identifying the government as the contracting party. Moreover, it was the Corps of Engineers, not the RDWC, which invited bids and awarded and administered the contract. These facts belie the government's contention that RDWC was the party which was bound rather than the United States. In general, where parties have executed a self-

contained, and, on its face, integrated document, the burden of changing the expressed obligations is heavy. See, e. g., *Woodbury v. United States,* 364 F.2d 993, 999–1000, 1003, 176 Ct.Cl. 838, 850–51, 857–58 (1966). No evidence has been offered which would lead us to believe that the government could meet such a burden.

The strongest documentary evidence which might be asserted to support the contention that the government acted solely as an agent for the RDWC, and did not intend to be bound itself is contained in the Memorandum of Understanding, discussed *supra.* Although this memorandum created a right on the Corps of Engineers' part to proceed as an agent of the RDWC, if they so wished, it can hardly be said to require that all contracts pertinent to constructing the water system be executed exclusively in this agency capacity. In the instant case, the government apparently chose not to do so.

It might also be noted that this issue does not seem to have come up in the litigation which was pursued in the Board of Contract Appeals. The Board, in its decision, clearly treated the United States as the contracting party. This strengthens our conclusion that in fact the United States was a party to the contract, and was obligated thereunder.

■ At this point, it is appropriate to note that defendant submits that a modification issued during the course of performance had the effect of clarifying the agency relationship between the United States and the RDWC. Modification 13 was issued on February 28, 1967, for the stated purpose of reflecting correct administrative and appropriation data. In essence, the modification substituted the RDWC as the party to be charged for supplies and services obtained by the contract. The modification specifically indicates, however, that "[t]he * * change is for administrative purposes only and is not intended to affect the substantive rights of either party."

The modification itself was never signed by a representative of the DeMauro Corp. There was, however, a cover letter accom-

panying the modification which was signed by the company. The cover letter requested that if the modification was satisfactory, the contractor sign the letter to indicate acceptance thereof and return it to the contracting officer. The cover letter apparently was a form which accompanied all modifications. Nothing in either the modification itself or in the letter was calculated to put the contractor on notice of a possible novation. The modification, if anything, achieved the opposite result by stating that the rights of the parties were not therein altered.

Defendant has, nevertheless, cited some cases which it argues support its position that the United States is not obligated as a party to the contract. For example, defendant relies on *Best v. United States,* 292 F.2d 274, 154 Ct.Cl. 827 (1961). In *Best,* the United States Army solicited bids for an ammunition storage area in Germany and awarded the contract to Josef Best, who later sued for breach of contract. The court, in reviewing the claim, found not only that there was not a contract (rather, a requisition of materials and labor from an occupied country), but also that any taking was done not by the United States acting in its sovereign capacity, but by the High Commission of the Allied Countries occupying Germany at the time. Even though the Army administered the contract, it had no authority to obligate the United States, which it had divulged to plaintiff, and was in any event acting as an agency of the Allied High Commission of Germany. Defendant contends that similarly the Corps of Engineers was acting as an agent of USCAR and the RDWC in administering the contract for the Tengan Dam. This argument is faulty, however, because in *Best,* the Army was affiliated for purposes of the procurement with the Allied High Commission. In the Ryukyus, the Commissioner, head of USCAR, was an appointee of the United States Department of Defense. Furthermore, the occupation was administered solely by the United States, unlike the occupation of Germany, where a joint Commission might have been said to be responsible for damages in *Best.* The

RDWC was an instrumentality of USCAR under its charter. Thus, the case is factually distinct from *Best,* and we cannot say there was no authority to bind the United States under these circumstances.

Defendant also urges that an analogy should be drawn to *Porter v. United States,* 496 F.2d 583, 204 Ct.Cl. 355 (1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975), which concerned a suit against the United States Government, arising out of a sea transportation contract between plaintiffs and officials of the Trust Territory of the Pacific Islands. The court held there was no jurisdiction, and no claim against the United States, in part because the Trust Territory government was created pursuant to a United Nations Trusteeship agreement, and thus was not an instrumentality or agency of the United States for contract purposes. Again, *Porter* does not preclude us from finding that there was authority to bind the United States to the contract in the instant case. Although it appears that a trusteeship form of occupation government was originally contemplated, *see Burna v. United States, supra,* 240 F.2d at 721, as events would have it the Ryukyus were never so administered. At all times in controversy, the United States exercised full jurisdiction over the Islands, and in theory at least, was answerable neither to a joint Allied Commission nor to the United Nations. Moreover, in *Porter,* the contract was signed on behalf of the Trust Territory, and not on behalf of the defendant. The court, therefore, declined to broaden the scope of the contract so far as to hold the United States liable under it. Here, the signature of the United States on the instrument, together with the exclusivity of American control of the Ryukyus, operates to require a finding that defendant, at the time the contract was signed, intended to be bound by it.

For purposes of this decision, it is established that the RDWC was an instrumentality of USCAR, created under the mandate of Executive Order 10713, to facilitate administration of the Ryukyus. Plaintiff argues from this that the RDWC had the

status of an instrumentality of the United States proper, and was capable by itself of binding the United States Government to its own contracts. Thus the mere form did not matter. Had the contract been executed by the RDWC, or if an agency relationship had been apparent on the face of the instrument, the United States would still be liable.

■■ The Congress, can, of course, create territorial sovereigns, of which the Government of the District of Columbia has had the longest life and is the best known. The consent to be sued, in the Tucker Act, does not normally embrace suits on the contracts of such sovereigns, even though they are beyond question instrumentalities of the United States. The theory is, perhaps, that they have their own sovereign immunity and should be the ones to waive it, if it is to be waived. Frequently, as in the case of USCAR, they have their own revenues. Non-use of United States appropriated funds in funding the activity involved in the contract is generally fatal to our jurisdiction. *McCloskey & Co. v. United States,* 530 F.2d 374, 208 Ct.Cl. 697 (1976) (D. C. Armory Board). Whether USCAR is a territorial sovereign of that character is a difficult issue which would have to be resolved if we should adopt the plaintiff's argument. Since the contract originally purported to bind the United States itself, not its instrumentality, the question as to the effect it would have had, if framed to bind the instrumentality, does not arise or is moot.

The *McCloskey* barrier against Tucker Act suits on the contracts of non-appropriated fund entities does not apply here because the Army Engineers had available U. S. funds appropriated directly for the Tengan Dam. Modification 13, above referred to, reveals specifically that the Engineers were drawing funds from two pockets, one the appropriated funds, the other the revenues of the RDWC. The record reveals that the many military activities on Okinawa were large users of the water. It would be strange to hold that the Engineers did not have authority to bind the United

States when they were using appropriated funds to carry out an authorized project for purposes directly related to United States national defense.

■ The language of pertinent appropriations acts, Foreign Aid and Related Agencies Appropriation Act, Pub. Law No. 88–258, 77 Stat. 857, 861 (1964) and Foreign Assistance and Related Agencies Appropriation Act, Pub. Law No. 88–634, 78 Stat. 1015, 1020 (1964), supports a finding that in fact funds were available for the construction of the Tengan Dam. For example, in Public Law No. 88–258, Congress stated that "$2,000,000 shall be available for transfer to the Ryukyu Domestic Water Corporation for the construction of a portion of the integrated water system." A similar appropriation of $4,000,000 was made available for the following year. The probability that Congress intended to devote appropriated funds to the water system project is further enhanced by the legislative history of Public Law 90–126, 81 Stat. 363 in which the Senate Committee on Armed Services acknowledged a responsibility on the part of the United States to contribute to the welfare of the people of the Ryukyus. *See* S.Rep.No. 674, 90th Cong., 1st Sess. (1967), U. S. Code Cong. & Admin. News 1967, p. 1767. *See also,* S.Rep.No. 1738, 86th Cong., 2d Sess. (1960) U. S. Code Cong. & Admin. News 1960, p. 3067. The thrust of the legislation passed concerning the Ryukyus, then, is that appropriated funds were not intended to be insulated from liability for contracts executed by American officials acting on behalf of the Ryukyuans.

Since the requirement is only that appropriated funds be available to satisfy contractual obligations, it is not necessary to reach the question, raised by defendant, of whether these funds were actually used. It might be noted that the clause in the Memorandum of Understanding stipulating that funds obligated by the Corps of Engineers be reimbursed by RDWC would not necessarily vitiate jurisdiction even if RDWC were not an instrumentality of the United States. This is so under the holding of *Hughes Aircraft Co. v. United States,* 534

F.2d 889, 209 Ct.Cl. 446 (1976). In *Hughes,* the court concluded that even where the funds expended were to be reimbursed in full by the United Kingdom, regular appropriated amounts were intended by Congress to be available pending reimbursement. This was sufficient to sustain a finding of availability of appropriated funds. 534 F.2d at 909–11, 209 Ct.Cl. at 477–79. The instant case is very similar, because even if the RDWC was expected eventually to reimburse the United States for the amounts expended in constructing the dam, pending reimbursement, these funds were intended to be available to fulfill America's commitment to improve the Ryukyuan standard of living.

Defendant's next argument is that whether or not it was a party to the contract at its inception, it no longer was obligated under that contract once the treaty accomplishing reversion of the Ryukyus to Japan was ratified and took effect on May 15, 1972. Defendant expounds the position that this treaty cut off any rights DeMauro might theoretically have had against the United States, and left plaintiff with the sole remedy of proceeding against the government of Japan in the Japanese courts. This follows because under the treaty, Article VI, the Ryukyu Domestic Water Corporation was transferred to Japan, and the rights and obligations of the RDWC were assumed by the government of Japan.

As plaintiff states, however, the rights on which it is suing accrued prior to the reversion of Okinawa under the treaty. It is well-established law that a treaty cannot extinguish these rights. *See Board of County Commissioners v. Aerolineas Peruanasa,* 307 F.2d 802, 806–08 and n. 4 (5th Cir. 1962) (per Bell, J.), *cert. denied,* 371 U.S. 961, 83 S.Ct. 543, 9 L.Ed.2d 510 (1963). *Cf. Abbott v. United States,* 112 F.Supp. 801, 803, 125 Ct.Cl. 330, 333–34 (1953). This is especially so in view of the fact that nowhere in the treaty is there any suggestion that Japan is to assume these obligations. The assumption of liabilities is made with respect to RDWC and other Ryukyuan utili-

ties created by USCAR. As stated in *Abbott, supra,* in the absence of any express intent by Congress to cut off rights, we retain jurisdiction, particularly in cases where a large portion of the claim might be lost by operation of the statute of limitations should plaintiffs be required to sue in a different forum. 112 F.Supp. at 803, 125 Ct.Cl. at 334.

To conclude, we find that defendant's arguments concerning this court's lack of jurisdiction are without merit and, as found by the Board of Contract Appeals, plaintiff is entitled to an equitable adjustment for the changed condition encountered during performance of the contract. Since defendant consistently refuses to negotiate with plaintiff, as directed by the Board, this action for breach of contract is properly maintainable in this court. *See Universal Ecsco Corp. v. United States,* 385 F.2d 421, 425–26, 181 Ct.Cl. 10, 17–19 (1967); *New York Shipbuilding Corp. v. United States,* 385 F.2d 427, 436, 180 Ct.Cl. 446, 462 (1967).

Accordingly, we deny defendant's motion for summary judgment and grant plaintiff's cross-motion for summary judgment on the question of liability. The case is remanded to the Trial Division for further proceedings, pursuant to Rule 131(c) to determine the quantum of recovery to which plaintiff is entitled.